BCD-CV-18-04

EMILE CLAVET

     Plaintiff

v.

KEVIN DEAN, et al

     Defendants

**FINDINGS AND ORDER FOR
ENTRY OF JUDGMENT**

This matter came before the Court for a bench trial on September 10-12, and 16, 2019. Plaintiff Emile Clavet is represented by Attorney Clifford Ruprecht, and Defendants Kevin Dean and Cecile Dean are represented by Attorneys George Marcus, David Johnson and Daniel Rosenthal. The parties elected to make their closing arguments in writing. The Court has reviewed the evidence from trial, has considered the parties' written submissions (the last of which was received on November 18, 2019) and issues the following findings and order for entry of Judgment.

## **FINDINGS**

The Plaintiff's Complaint brought seven counts but the Court in a prior Order dismissed Count VII for aiding and abetting breach of fiduciary duty against Cecile Dean. Count V for constructive trust was withdrawn by Plaintiff in his Post-Trial Brief, pg. 2. Counts remaining for decision are: Count I for fraud; Count II for breach of fiduciary duty; Count IV for unjust

1

enrichment; Count VI for fraudulent transfer, and a claim for punitive damages. Little argument was presented in either brief filed by Plaintiff on his Count III claim for negligent misrepresentation. The Court interprets this as Plaintiff having brought Count III as an alternative claim to Count I.

The case centers around the September 2016 purchase by the Defendants of the Plaintiff's membership interests in two entities they jointly owned, Blue Water, LLC and Covered Marina, LLC (hereinafter the "Marinas"). The parties have a long history of running multiple businesses in Maine and later in Texas. These businesses have included real estate development, hotels, a storage facility, a car wash, two small insurance entities, and the utility Electricity Maine. They began their business ventures with almost no money, but after reinvesting proceeds of sales of businesses into other businesses, they became very successful. Over the years they have been friends as well as business partners, and their families and children were friends as well. While they had the ability to run businesses without the other person, and were legally permitted to compete with each other, it is clear to the Court that they were most successful when they worked jointly. Although they have different strengths and qualities, Mr. Clavet and Mr. Dean are both very intelligent and savvy businessmen. As counsel for Mr. Dean put it, "In every way Emile was Kevin's equal and peer in business matters." [Defendants' Post-Trial Brief, pg. 3]. The parties disagree as to whether before this dispute arose they had already stopped being good friends and had begun to "unwind" their businesses as a result, or whether it is the dispute at the center of this lawsuit that irrevocably changed their friendship and made it impossible for them to continue working together as business partners. [1]

---

[1] Also pending in this Court is BCD-CV-18-49 which was referred by the Court to a Special Master, Eric Purvis. In that case the parties seek, in part, a judicial dissolution and/or dissociation. In a recent teleconference the parties agreed to a briefing and hearing procedure on that matter. The Court informed the parties that it would issue this

For over 10 years the parties owned the Marina properties which were located on the gulf coast of Texas. They agree that the properties never provided reliable cash flow, and were very difficult to insure. Periodically they would discuss selling the Marinas for these reasons. Mr. Dean, who has roots in Texas, was the party who managed the Marinas, and he employed his sister and her husband to run the properties day to day. The parties seem to agree that the Marinas would only be valuable if they could sell to "the right kind of buyer", namely someone interested in developing the properties. When brokers would call Mr. Dean with a prospective buyer, he would ask whether the buyer wanted cash flow or a development project, as only a development made economic sense. They paid $2.5 million dollars to purchase the properties, and under the two LLC agreements they each had 50 percent membership interests.

In September of 2016 a broker for a company called TCRG called Mr. Dean to discuss buying the Marinas. The Court has reviewed the chronology and summary of testimony in Exhibit A attached to Plaintiff's Post-Trial Brief, and finds that it accurately sets out documented communications between the parties along with proper citations to the trial record.[2] The Court finds, based in part on the evidence summarized in that exhibit, that Mr. Dean breached a number of legal duties which he owed to Mr. Clavet. Because of the interrelation between fraudulent misrepresentation and breach of fiduciary duty under Maine law, and because the factual findings that the Court must make on both claims significantly overlap, the Court will analyze Counts I and II together.

Order without consideration of the recommendations made by Mr. Purvis, and would do so without delaying either case.
[2] Defendants take issue with a number of assertions made about Mr. Dean's conversations with Mr. Clavet, during the month of September of 2016 in particular. Mr. Dean claims that they first talked about the TCRG offer at the end of August 2016 and that Mr. Clavet's response was to say that the offer from Mr. Donley was a "waste of time." Mr. Clavet denies this conversation ever occurred and argues further that if it did there was all the more reason for Mr. Dean to supplement that information once he understood that Mr. Donley's offer was a bona fide offer for a substantial sum.

***Counts I and II: Fraud and Breach of Fiduciary Duty***

In order to prevail on Count I, the Plaintiff must prove by clear and convincing evidence each of the following: 1) that Mr. Dean made a false representation of a material fact; 2) that he did so with knowledge of its falsity or in reckless disregard of whether it is true or false: 3) that he did so for the purpose of inducing another to act or refrain from acting in reliance on it; and 4) Mr. Clavet justifiably relied upon the representation as true and acted upon it; and 5) that Mr. Clavet was damaged by it. *Cianchette v. Cianchette,* 2019 ME 87, ¶ 20, 209 A.3d 745.

In this Court's Combined Order on Cross Motions for Summary Judgment, the Court held that an omission by silence can constitute the supplying of false information as proof of intentional misrepresentation, but only in circumstances when there exists a special relationship such as a fiduciary relationship, which imposes on the defendant an "affirmative duty to disclose." *Glyn v. Atl. Seaboard Corp.,* 1999 ME 53, ¶ 12, 728 A.2d 17. In that case the Law Court stated, "Where a fiduciary relationship exists between the parties, 'omission by silence may constitute the supplying of false information,'" *Id.* (quoting *Binette v. Dyer Library Assoc.,* 688 A.2d 898, 903). *See also Brown v. Oral Surgery Associates,* 2003 ME 11, ¶ 22, 819 A.2d 1014.

As the parties know, the Combined Order was issued just hours before the Law Court announced its decision in *Cianchette.* The Court in light of that decision granted Mr. Clavet's Motion for Revision in part and found as follows: "Pursuant to statute, as a manager, Mr. Dean was a fiduciary to Blue Water and its other member – Mr. Clavet – during all times relevant to this lawsuit." *Order on Motion for Reconsideration and Revision,* Aug. 2, 2019 pg. 7.

4

The Court finds after considering all the trial evidence that Mr. Dean intentionally omitted material information which he had a duty under Maine law[3] to provide to the other member of Blue Water, LLC, Mr. Clavet. That information consisted of the inquiries and communications from TCRG that began on August 30, 2019 and which soon turned into an offer from Mr. Donley for TCRG to purchase the Marinas for the sum of 8.0 million dollars. That offer changed to 7.5 million dollars no later than September 13, 2019, just two days before Mr. Dean emailed Mr. Clavet to tell him that their wives needed to provide personal guarantees in order to have a line of credit, "and if you don't want to do that, then give me a price you want for your portion of the marina or figure a swap of other stuff." Joint Exh. 4.

The purchase and sale agreement between Mr. Dean and TCRG was completed on September 30, 2019. Mr. Clavet, on that same day, and completely in the dark about the agreement between Mr. Dean and TCRG, signed over his membership interests in the Marina properties to Mr. Dean. Joint Exh. 6, Trial II/26.

The sale of the Marina properties to TCRG was not completed until February of 2017. Tr., V.IV at 165-176. However, Mr. Clavet still was not told about the sale of the properties to TCRG until months went by. It was not until Mr. Dean had to disclose to Mr. Clavet that they

---

[3] In their post-trial arguments and pre-trial motions, the parties argued extensively about the differences between Maine law, which they agree governs Blue Water, LLC and Texas law, which they agree governs Covered, LLC. The Court has reviewed its prior orders regarding Texas law, and has reviewed the cases cited by the parties in their post-trial filings, including *Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d, 355, 393-396 (Tex. App, 2012) and Texas cases that interpreted and applied that case in different factual contexts. Plaintiff argues that *Allen* stands for the proposition that Texas recognizes a "formal" fiduciary duty in the LLC context under the "special facts" doctrine. Defendants emphasize that *Allen* applies only to LLC's managed by a majority-owner, and not to LLC's that are equally owned. Plaintiffs note that Defendants cannot point to any post-*Allen* case where the duty was not applied on the grounds that ownership was equally shared. The Court is reluctant, for reasons it hopes are obvious to the parties, to resolve this question of Texas law when the Texas courts appear not to have done so. However, the Court agrees with Plaintiff that if it finds by clear and convincing evidence that there was a breach of fiduciary duty under Maine law as to Blue Water, along with proof of the other elements of intentional misrepresentation as to Mr. Dean's purchase of Blue Water, and that if the breach caused Mr. Clavet to relinquish his interests in both LLC's, the remaining issue becomes the measure of damages for Plaintiff's loss. [See, Plaintiff's Post-Trial Reply Brief, pg. 15.

both had been named in a lawsuit brought by TCRG regarding the closing process on Marinas purchase by TCRG, that Mr. Dean let Mr. Clavet know that he had to go to Texas to be deposed as he had been sued as well. The Court finds that this conduct, together with evidence that Mr. Dean directed office staff to send mail addressed to Mr. Clavet about the lawsuit to Mr. Dean's sister instead of Mr. Clavet, supports Mr. Clavet's position that Mr. Dean had no intention of disclosing the sale until facts and circumstances compelled him to do so. Prior disclosure would have revealed to Mr. Clavet that Mr. Dean had timed and manipulated his buyout of the Marina interests from Mr. Clavet in order to keep the proceeds of the sale to TCRG for himself. At the time Mr. Dean made the contract with TCRG to sell the Marinas for 7.5 million dollars, he was simultaneously persuading Mr. Clavet to sell him his membership interests in those properties for a significantly lower price. Obviously, in order to legally sell the Marinas by himself, he had to own them by himself.

Mr. Dean's secret negotiations with TCRG, together with the timing of the communications, all add up to clear and convincing evidence of the supplying of false information in the form of "omission by silence" and also constitutes a violation of Mr. Dean's fiduciary duty to Mr Clavet. They also add up to clear and convincing evidence that the information was intentionally withheld "for the purpose of inducing" Mr. Clavet to refrain from acting in reliance upon it. Any co-owner in Mr. Clavet's position would have wanted to know about the offer that TCRG made to Mr. Dean. The Court further finds by clear and convincing evidence that these omissions were material, if for no other reason but that there is such a substantial difference between the sales price of 7.5 million dollars to TCRG, and the purchase price of Mr. Clavet's interest for 2.5 million dollars by Mr. Dean. As stated by Mr. Clavet's counsel, after years of failing to find the right buyer for the marinas, "It was highly material to

know that there was in fact a buyer who had offered 7.5 million dollars and that Kevin was actively negotiating toward a price of $8 million or very close to it."

Defendants argue further that Mr. Clavet cannot prove "reasonable reliance" because he never asked follow up questions to Mr. Dean about the initial inquiry from TCRG. As noted previously, Mr. Clavet denies ever being told about that inquiry. However, the Court agrees with Plaintiff's argument that if in fact Mr. Clavet was told *something* about the inquiry, this was all the more reason for Mr. Dean to update Mr. Clavet with the more material information that was withheld, namely that the inquiry almost immediately became an offer that was substantial and bona fide. The Court also notes that the parties had, throughout their course of dealings, relied upon one another to stay informed about material matters, even if one or the other took the lead on certain projects. The documented communications between the parties at the critical times were frequent, mutual and cordial, and it would have been a very simple matter for Mr. Dean to update Mr. Clavet on his ongoing negotiations with TCRG. Given the history between the parties, the fact that Mr. Dean was the only owner in possession of this information, along with his efforts to misdirect Mr. Clavet's attention toward the fiction that the bank was demanding that their wives would have to personally guarantee the continuing line of credit, the Court finds clear and convincing evidence of "reasonable reliance" on the part of Mr. Clavet.

### Count IV: Unjust Enrichment

The parties agree as to what are the elements for unjust enrichment under Maine law, but disagree as to whether the existence of a contractual relationship precludes any recovery under a claim for unjust enrichment.

7

In Maine, in order to recover for unjust enrichment a Plaintiff must prove the following: 1) that Plaintiff conferred a benefit on the defendant; 2) the defendant appreciated or had knowledge of the benefit; and 3) that the defendant's acceptance or retention of the benefit under the circumstances makes it inequitable for the defendant to retain the benefit without payment of its value. *Estate v. White,* 521 A.2d 1180, 1183 (Me. 1987).

The Court agrees with the Defendants that under Maine law, if there is a contractual relationship, the remedy of unjust enrichment is precluded. "The remedy of 'unjust enrichment describes recovery for the value of the benefit retained *when there is no contractual relationship.* but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay.'" *Nadeau v. Pitman,* 1999 ME 104, ¶ 14, 731 A.2d 863 (quoting *Paffhausen v. Balano,* 1998 ME 47, ¶ 6, 708 A.2d 269) (emphasis added).

The Court agrees with the Defendants that the essence of the parties' legal relationship is contractual, and further agrees with the statement made by Defendants' counsel as follows: "Without the LLC agreements, Emile (sic) and Clavet would not have been co-members or co-managers of the Marinas; Kevin would not owe Emile the duties that Emile says he owes; and there would be no basis for Emile's assertions that Kevin has been enriched unjustly." Defendants' Post-Trial Brief, pg. 29.

The Court concludes as a matter of law that the existence of the parties' contractual relationship precludes recovery by Plaintiff under a theory of unjust enrichment.[4] *Id.*

---

[4] Plaintiff also seems to recognize that if the Court awards damages for fraudulent misrepresentation and/or breach of fiduciary duty, that any damages awarded for unjust enrichment would be duplicative of those damages. See the heading in Plaintiff's Post-Trial Brief, pg. 19: "Plaintiff is Entitled to Compensatory damages *or* to Disgorgement."

### Count VI: Fraudulent Transfer

In order to prevail on his Count VI claim for Fraudulent Transfer, Plaintiff must prove by clear and convincing evidence that Mr. Dean transferred his membership interests to his wife Cecile "with the actual intent to hinder, delay or defraud any creditor" of Mr. Dean. 14 M.R.S. § 3575(1)(A); *Morin v. Dubois*, 1998 ME 160, ¶ 3, 713 A2d 956. The evidence on this claim centers on why Mr. Dean transferred his interests in the Marinas to his wife within weeks after Mr. Clavet sold his interests in the Marinas to Mr. Dean.

While this fact is undisputed, what is in dispute is Mr. Dean's actual intent at the time he transferred his interest in the Marinas to his wife. Plaintiff claims that he made the transfer to hinder or defraud him, while Defendants claims that he made the transfer for estate planning purposes.

Plaintiff has brought this claim under 14 M.R.S. § 3575(2) which sets out a number of factors that courts are to consider in determining what the statute refers to as the "actual intent" of the debtor.[5] These factors include whether the transfer was made to an insider; whether the debtor retained possession or control of the property transferred after the transfer; whether it was disclosed or concealed; whether before it was made the debtor was sued or threatened with suit; whether it was of substantially all of the debtor's assets; whether the debtor absconded; whether the debtor removed or concealed assets; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and whether the debtor transferred the essential

---

[5] The Defendants claim that Mr. Dean is not a "debtor" of Mr. Clavet's for purposes of this analysis but the Court notes that the definitions section of the statute broadly defines a debtor as "a person who is liable on a claim." 14 M.R.S. §§ 3572(5) and (6).

assets of a business to a lienor who had transferred the assets to an insider of the debtor. While some of these factors may be generated by the evidence, some clearly are not. The more important issue given the trial record presented is whether the factors that are generated constitute clear and convincing evidence of Mr. Dean's "actual intent" at the time he made the transfer to his wife.

Attorney Shawn Bell testified that he understood based on his conversations with Mr. Dean that the transfer to Mrs. Dean was done just after the parties closed on the "Spark" transaction, and that the parties put money in escrow as they were concerned about "potential litigation". Tr., V.II. at 12. While Mr. Bell described the transfer as "an asset protection option" it is not particularly clear to the court what potential creditors Mr. Bell was describing, and whether those creditors were creditors who might have claims based on the Spark transaction,[6] or whether he was referring specifically to Mr. Clavet as the creditor who was being harmed by the transfer. Mrs. Dean was not called by either party as a witness for trial, and so the Court is left to try and reconcile Mr. Bell's statements about what he "believed" to be Mr. Dean's intent with Mr. Dean's denials.

The Court concludes that this evidence falls short of constituting clear and convincing evidence of Mr. Dean's actual intent at the time the transfer was made. Therefore, the claim in Count VI will be denied for that reason.

[6] If Mr. Dean's intent was to shield himself from Electricity Maine creditors, the Court would have to question whether Mr. Clavet would have standing to ask the Court to provide a remedy to him as part of the claim he is making in this case.

***Remedies for Fraudulent Misrepresentation and Breach of Fiduciary Duty***

In assessing damages for these claims, the Court must decide at the outset what Mr. Clavet sold to Mr. Dean. Defendants claim that what was sold was only Mr. Dean's "membership" interests while Plaintiff insists that what was sold was the value of the LLC assets that the Marina entities owned. The Court would note, however, that while the attorneys may disagree on what was sold, the parties themselves agreed that Mr. Clavet sold his half interest in the Marina companies, but they agreed to value it as the amount that they had actually paid for the Marina properties; that is, the parties agreed to treat the value of the assets as a proxy for the value of their membership interests, and Defendants have failed to persuade the Court that their agreement should carry no legal weight.

The Court has reviewed the parties' arguments regarding remedies, and the cases cited by them. A case from the First Circuit, *Janigan v. Taylor,* 344 F.2d 781 (1st Cir. 1965), is very similar factually to this case, and the First Circuit lays out persuasively how damages should be calculated under the facts presented here. The defendant in *Janigan* purchased plaintiffs' stock, which represented virtually all of the outstanding stock of the company, for $40,000. Not long after, he sold it for $700,000. In deciding to sell the stock, the plaintiffs relied upon a statement the defendant admitted he made at a directors' meeting about the condition of the company. The District Court found the representation to be "consciously and materially false and . . . that plaintiffs relied on it." *Id.* at 784. Damages were awarded to Plaintiff in the amount of Defendant's net profits.

The Defendant appealed the finding of misrepresentation and the measure of damages. The First Circuit upheld the finding of misrepresentation, and had the following to say about the measure of damages:

11

With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy something that one would not have bought or would not have bought at that price, and where by fraud one is induced to convey property to the fraudulent party. In the former case the damages are to be reckoned solely by the "difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering the "expected fruits of an unrealized speculation."

On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer, even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party . . . . However, there can be no speculation but that the defendant actually made the profit and, once it is found that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

*Id.* at 786 (citing *Sigafus v. Porter,* 179 U.S. 116 (1900) and *Marcus v. Otis,* 168 F. 2d 649, 660 (2d Cir. 1948)).

In this case the Court finds that the profit Mr. Dean made and kept to himself at the time TCRG purchased the Marina properties was the "proximate consequence" of the fraudulent misrepresentation that Mr. Clavet has proven by clear and convincing evidence. In *Janigan,* the Court cautioned that there are "limits" to this principle, but there can be no credible concern here about the foreseeability of the damages in the form of profit Mr. Dean made from the sale to TCRG. While the original purchase price to be paid by TCRG changed, the new figure was known to Mr. Dean at the time the fraudulent misrepresentation was made, and the essentials needed to calculate the net profit are laid out in the settlement statement.

The Court will therefore award to Mr. Clavet damages based upon the calculations set out on pages 35-36 of Plaintiff's Post Trial Brief. It represents the difference between, as Plaintiff's counsel put it on pg. 29 of his Post-Trial brief, "value represented v. actual value based on the true state of affairs" and the Court has relied upon *Janigan* in concluding that this is the most

12

sound approach to take in this case. It is undisputed that Mr. Dean and Mr. Clavet agreed to value the Marina properties at 2.5 million dollars, and the Court has found the parties agreed that what was actually sold were the assets held by the LLC's. The total net proceeds are then determined by the amount payable by TCRG at closing in the amount of $7,977,680.27 (calculated as the contract price plus TCRG's share of pro-rated items, Plaintiff's Exh. 10 and Tr. I/96-97) minus the settlement charges of $670,317.21 which do not take into account Mr. Dean's decision to pay his sister Debbie Dean $150,000 from the closing proceeds.[7] The Court finds that the parties had agreed that the credit line balance would be paid off when Mr. Dean purchased the Marinas from Mr. Clavet, and the Court will therefore deduct $320,000 from those proceeds. The Court will then apply a credit to Mr. Dean for what he actually did pay to Mr. Clavet in the amount of $977, 500. This results in damages in the amount of $2,516,181.53 that the Defendants will be ordered to pay the Plaintiff.

The Court declines to reduce Plaintiff's damages by deducting intercompany items as the course of dealings between the parties indicates that they did not themselves consider those figures when they valued their various companies, and the Court finds Mr. Clavet's testimony credible on this issue as it is consistent with their past practices. Tr. IV/285L 18-24; III.141-142. In addition, the Court would have to engage in speculation about how and when the parties might have chosen to reconcile their obligations if Mr. Clavet had been included in the TCRG transaction. That would violate the principle that the calculation of damages must be based on reasonable certainty. The Court has concluded that this level of certainty can be achieved by relying upon evidence of the actual agreement between the parties as to what they had explicitly agreed was the value of the property, what should be paid in the way of debt when ownership

---

[7] The Court has concluded that given the factual findings made, it would be unjust to permit Mr. Dean to siphon off some of the damages that resulted from the fraudulent misrepresentation that has been proven here.

was transferred to Mr. Dean, along with the standard costs incurred at the closing of the sale to TCRG.

The Court further rejects Defendants' arguments regarding the cash payments made by Mr. Dean to Mr. Clavet. The Court finds Mr. Wolverton's testimony to be credible in this regard when he stated that he saw no indication that Mr. Clavet was intentionally trying to hide money that he had received from Mr. Dean in order to pay taxes. The evidence is that the money Mr. Clavet received in 2016 was duly reported, and the amount he received in 2017 was as well. Tr. III/75: 15-76. The Defendants' theory is not supported by credible evidence in the record.

### *Punitive Damages*

In Maine punitive damages may only be awarded if the Court finds by clear and convincing evidence that the defendant acted with actual or implied malice. *Tuttle v. Raymond,* 494 A.2d 1353 (Me. 1985).

The Court finds in this case that Mr. Dean has convinced himself that he deserved to keep the profits of his fraudulent scheme. He implied that he was a better businessman than Mr. Clavet, that he worked longer hours than Mr. Clavet, and that the nature of their relationship had somehow changed that in his view justified concealing the true value of the Marina properties from the person who owned the other half of the LLC's. Mr. Dean told Attorney Bell that he did not tell Mr. Clavet about the TCRG transaction because he worked harder than Mr. Clavet. It is impossible to know exactly how intense this resentment was at the time the fraudulent transaction unfolded, or if it has become even more extreme as a result of this litigation. However, it is clear to the Court that at all pertinent times Mr. Dean had no appreciation or respect for the legal reality that he and Mr. Clavet owned the Marina assets equally, and his

14

scheme to defraud Mr. Clavet of his rightful share of the proceeds of the sale to TCRG can only be described as brazen. He had multiple opportunities over a period of months to correct the fraud and come clean with Mr. Clavet but decided not to do so. His conduct would never have come to light but for litigation that was brought against him and Mr. Dean that arose from the TCRG closing, and he kept Mr. Clavet in the dark about that litigation until he had no other choice but to tell him. The difference between the amount Mr. Dean paid Mr. Clavet for the Marina assets and the amount he tried to pocket for himself from the TCRG sale is significant. All of this in the view of the Court constitutes clear and convincing evidence of actual malice on the part of Mr. Dean.

The Court is expected to weigh aggravating and mitigating factors in determining the amount of damages to award, and the Law Court has indicated that ratios between actual damages and punitive damages can be considered. The Court considers Mr. Dean's obvious work ethic and his commitment to his family to be mitigating factors. In addition, the harm here is clearly economic. On the other hand, the infliction of the economic injury here was significant, and was done intentionally. The Plaintiff suggests that the award of punitive damages affirmed by the Law Court in *Cianchette v. Cianchette,* 2019 ME 87, 209 A.3d 745, is closely analogous and notes that the ratio of the punitive damages to the tort liability assessed against one Defendant in that case was 7.04, but the Court sees a number of differences between what the jury must have concluded Cianchette and what the Court has found here. The Court must also consider the ability of Mr. Dean to pay any punitive damages, and finds that he has such ability based on his other business ventures and property.

In considering all of these factors, the Court has concluded that an award of punitive damages in the amount of $750,000 is justified in this case.

The entry will be:

Judgment is entered for Plaintiff on Counts I and II for Fraudulent Misrepresentation and Breach of Fiduciary Duty in the amount of $2,516,181.53. Count III for negligent misrepresentation is dismissed given the Judgment entered on Count I. Judgment is entered for Defendants on Counts IV for Unjust Enrichment and VI Fraudulent Transfer. Count V was withdrawn by Plaintiff. Punitive Damages are awarded to Plaintiff in the amount of $750,000. Plaintiff shall have interest and his costs.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

  January 8, 2020                            /s              

    **Date**                                   **Justice M. Michaela Murphy**
                                         **Business and Consumer Court**

STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                         DOCKET NO. BCD-CV-2018-04


EMILE CLAVET,                    )
                                 )
  Plaintiff,                     )
                                 )      **COMBINED ORDER**
      v.                         )      **ON MOTIONS FOR**
                                 )      **RECONSIDERATION**
KEVIN DEAN, et al.,              )      **AND REVISION**
                                 )
  Defendants.                    )

On June 4, 2019, this Court entered its order on these parties' cross-motions for partial summary judgment (the "Prior Order"), granting each motion in small part but otherwise denying the motions based on multiple genuine, material factual disputes that the Court identified in the Prior Order. Each side has moved for reconsideration of the Prior Order. Both motions are fully briefed, and the Court exercises its discretion and decides the motions without holding oral argument. M.R. Civ. P. 7(b)(7).

BACKGROUND

The facts of this case as alleged are well-known by the Court and the parties. (*See* Prior Order 1-6.) In a nutshell, Mr. Clavet and Mr. Dean, former business associates who founded, ran, and sold many companies together over the years, owned two LLCs—Blue Water Marina, LLC ("Blue Water"), and Covered Marina, LLC ("Covered")—that in turn owned and operated a marina (the "Marina") in Texas. Mr. Dean solicited Mr. Clavet for his membership interests in the businesses. After sharing with him accurate information about the struggles the marina had experienced over the years, allegedly inaccurate information that the Marina's bank was requiring personal guaranties on the Marina's line of credit, Mr. Dean suggested that the purchase price the men had paid for the Marina years ago was an appropriate valuation of the business: $2.5 million.

1

Mr. Clavet agreed and sold Mr. Dean his interest in the two companies based on Mr. Dean's appraisal (half of $2.5 million value minus debt).

However, Mr. Dean did not tell Mr. Clavet was that he was simultaneously negotiating the sale of the Marina to a third party, TCRG Opportunity X, LLC ("TCRG"), at a much higher price— originally, over eight million dollars, although the price was subsequently negotiated down to the still higher value of $7.9 million. Mr. Dean has claimed that he did mention something about TCRG's initial outreach to Mr. Clavet, but that Mr. Clavet responded that it sounded like a "waste of time. Over the course of barely a week, Mr. Dean was able to finalize the sale of the Marina to TCRG — a mere two days after he bought out Mr. Clavet's interests in the two LLCs based on a much lower valuation. Mr. Dean even informed TCRG that he needed to postpone the closing to accommodate this "small transfer of interests."

As explained in the Prior Order, fraud can be proved by silence or omission only when the defendant had a duty to speak, either because of a special relationship between the defendant and plaintiff or because a statute imposes such a duty, or where the defendant takes active steps to conceal the omission. (Prior Order 8-9.) Mr. Clavet argued at summary judgment that the undisputed facts established a fiduciary relationship between Mr. Dean and himself, but struggled to identify the grounds for such a relationship. The essence of his argument was that the specific facts of this case imposed a common law "limited" fiduciary duty on Mr. Dean to disclose the negotiations for the sale of the Marina to Mr. Clavet in this one transaction. The Court could find no authority for the principle of "limited" fiduciary duties or relationships and Mr. Clavet did not identify any such authority. The Court thus analyzed the issue under traditional legal principles and concluded that under Maine law, there is no legal basis to impose fiduciary duties on Mr. Dean

2

vis-à-vis Mr. Clavet, but that under Texas law, there is a factual dispute on that issue. Principally, it is that conclusion that both parties ask the court to revisit on the instant motions.

An interesting happenstance partly motivates Mr. Clavet's motion. In arguing for the proposition that Mr. Dean owed Mr. Clavet fiduciary duties, Mr. Clavet's written memoranda never mentioned perhaps the most obvious source of that duty: Mr. Dean's status as manager of Blue Water. At the time of the summary judgment hearing, Maine's Supreme Judicial Court had not established whether a manager of a LLC owes "default" fiduciary duties to the LLC or its members, although this Court and at least one other Superior Court had construed section 1559(1)(3) of Maine's LLC Act as imposing such a duty unless specifically waived in the LLC operating agreement. *See Cianchette v. Cianchette*, No. CV-16-249, 2018 Me. Super. LEXIS 13, at *34-40 (January 17, 2018); *Gleichman v. Scarcelli*, No. BCD-CV-17-11, 2019 Me. Bus. & Consumer LEXIS 8, *27-28 (March 7, 2019). At the oral argument, the Court inquired of both parties about this theory of proving a fiduciary duty, and Mr. Clavet responded that section 1559 "doesn't have any particular relevance to this case."

As it turned out, the Law Court construed Maine's LLC Act consistent with the trial court as imposing default fiduciary duties on LLC managers—in an opinion published approximately two hours after this Court entered the Prior Order. In that order, this Court, "[g]iven the unsettled state of the law on th[e] issue," had declined to apply a statute that Mr. Clavet himself argued had no particular relevance.  (Prior Order 14.) *See Cianchette v. Cianchette*, 2019 ME 87, ¶¶ 33-35, __ A.3d __ ("The Act expressly imposes fiduciary duties upon the manager of an LLC"). In other words, the state of the law was settled a few hours later that same day. As analyzed in more detail below, in light of *Cianchette*, Mr. Clavet now asks the Court to apply a statute he once claimed was irrelevant. *Cianchette* also explicitly adopted the formulation of fraudulent misrepresentation

3

from the Restatement (Second) of Torts. *See Cianchette*, 2019 ME 87, ¶¶ 23-27; *see also* Restatement (Second) of Torts §§ 525, 530. Mr. Clavet argues here that this change in law likewise requires revision of the Prior Order's conclusions on his fraud claim.

ANALYSIS

Under M.R. Civ. P. 7(b)(5), a motion for reconsideration "shall not be filed unless required to bring to the court's attention an error, omission, or new material that could not previously have been presented." "Rule 7(b)(5) is intended to deter disappointed litigants from seeking 'to reargue points that were or could have been presented to the court on the underlying motion.'" *Shaw v. Shaw*, 2003 ME 153, ¶ 8, 839 A.2d 714 (quoting M.R. Civ. P. 7(b)(5) advisory committee's notes to 2000 amend., 3A Harvey & Merritt, *Maine Civil Practice* 270 (3d, 2011 ed.)). "A motion for reconsideration of the judgment shall be treated as a motion to alter or amend the judgment." M.R. Civ. P. 59(e). A trial court's ruling on a motion for reconsideration is reviewable for an abuse of discretion. *Shaw*, 2003 ME 153, ¶ 12, 839 A.2d 714.

Mr. Dean claims that his motion, which seeks reconsideration of the Court's conclusion that there is a genuine factual issue as to whether Mr. Dean had an informal fiduciary relationship with Mr. Clavet under Texas law, fits into the "omission" category of Rule 7(b)(5). The Court disagrees. The "omission" from Mr. Dean's summary judgment motion (and opposition to Mr. Clavet's motion) was the twenty-three Texas cases Mr. Dean cites in this motion. In his original motion, Mr. Dean cites to eight state and federal Texas cases, six in a single string cite, with limited use of parentheticals and virtually no analysis. Nothing prevented Mr. Dean from citing these twenty-three cases when the original motions for summary judgment were litigated, and much of his motion is reargument of one of the most hotly contested legal issues at summary judgment with

4

the benefit of analogy to cases he omitted to cite the first time. *See Shaw*, 2003 ME 153, ¶ 8, 839 A.2d 714.

Finally, having nonetheless considered the Texas authority Mr. Dean belatedly brings to the Court's attention, the Court is not convinced that it entitles Mr. Dean to judgment as a matter of law on the issue of whether he owed Mr. Clavet an informal fiduciary duty under the facts of this case. None of the cases cited involved parties who had worked together nearly as long as Mr. Clavet and Mr. Dean did. Other factors such as the parties' lengthy period of shared office space and decades-long personal friendship further remove this case from the Texas cases' holdings. Essentially, Mr. Dean asks this Court to credit the factors that evidence independence between the men and disregard the factors that evidence an informal fiduciary relationship—quintessential weighing of evidence that is inappropriate for summary judgment. *Arrow Fastener Co. v. Wrabacon, Inc.*, 2007 ME 34, ¶ 16, 917 A.2d 123 ("a fact-finder, rather than a court acting on a motion for summary judgment, is responsible for weighing the evidence . . . ."). The Court denies the Deans' motion for reconsideration.

Mr. Clavet's motion is brought pursuant to M.R Civ. P. 54(b), which provides in relevant part that orders and decisions of trial courts are "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liability of all the parties." In essence, however, Mr. Clavet's motion is one for reconsideration. *See* M.R. Civ. P. 7(b)(5). Mr. Clavet argues that the Law Court's opinion in *Cianchette v. Cianchette* changes the state of Maine law in two important ways: (1) it removed any uncertainty as to whether managers of LLCs are fiduciaries with respect to the LLC and its other members pursuant to 31 M.R.S. § 1559(1),(3); and (2) it explicitly adopted one restatement provision that neighbors another restatement provision that he urges this Court to apply in this case. The Court addresses each proposed revision in turn.

5

Mr. Clavet's first proposed revision fits nicely into the M.R. Civ. P. 7(b)(5) standard. A "change of controlling law" is one of three "compelling reasons" explicitly recognized by the Law Court as proper grounds for reconsideration of a court order. *See Lord v. Murphy*, 561 A.2d 1013, 1016 (Me. 1989) (citing 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 790 (1981)). Mr. Dean argues that regardless of the change in law, Mr. Clavet has waived the argument that 31 M.R.S. § 1559(1),(3) imposes fiduciary duties since he argued that statute had "no particular relevance" at the summary judgment hearing, before the Law Court had authoritatively construed the statute.

The Court concludes that Mr. Clavet has not waived the argument under the circumstances of this case. First, Mr. Dean's argument and authority with respect to waiver is misplaced. The issue is not whether Mr. Clavet has waived a legal right, such as a right to enforce a deed restriction, *see Chalet Susse Int'l v. Mobil Oil Corp.*, 597 A.2d 1350, 1351 (Me. 1991), but rather whether he is estopped from pursuing a legal argument that he previously seemed to disavow. This sounds much more like judicial estoppel than waiver. *See Me. Educ. Ass'n v. Me. Cmty. Coll. Sys. Bd. of Trs.*, 2007 ME 70, ¶ 16, 923 A.2d 914 (citation omitted). Judicial estoppel is a doctrine which generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase, regardless of whether the issue was actually litigated previously. *Id.* (citations and quotations omitted). The standard for application of judicial estoppel has not been satisfied because Mr. Clavet did not prevail at summary judgment. Moreover, the Court did not apply a different construction of section 1559 based on Mr. Clavet's representation at the oral argument, it simply did not factor the statute into its analysis based on Mr. Clavet's position that the statute did not "have any particular relevance." Given that both parties have been given an opportunity to reargue the statute's relevance in light of the Law Court's

6

authoritative construction in *Cianchette*, there is no prejudice to Mr. Dean for the Court to now consider the applicability of section 1559 to this matter. Indeed, at the oral argument, Mr. Dean conceded that once *Cianchette* was decided the parties and the Court would have to "deal with it" and "figure out . . . how the facts relate[ ] to what we have here." The instant motion, in light of the decision in *Cianchette*, presents the opportunity for the Court and the parties to "figure [it] out."

Discerning no bar to Mr. Clavet's re-visitation of the section 1559 argument, the Court concludes that Mr. Clavet's reconsideration motion is proper, and takes this opportunity to apply the Law Court's construction of 31 M.R.S. § 1559(1),(3) to this case. Pursuant to statute, as a manager, Mr. Dean was a fiduciary to Blue Water and its other member—Mr. Clavet—during all times relevant to this lawsuit.[1] Issues of breach and damages will be determined at trial.

Mr. Clavet's second point for reconsideration is also grounded in a change in controlling law reflected in *Cianchette*, but is decidedly less certain as it applies to this case. In *Cianchette*, the Law Court explicitly adopted the Restatement (Second) of Torts § 525 for its formulation of fraudulent misrepresentation. *Cianchette*, 2019 ME 87, ¶ 23, __ A.3d. __. It then cited Restatement section 530 for the proposition that "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention[,]" overruling *Shine v. Dodge*, 130 Me. 440, 443, 157 A. 318, 319 (1931) and abrogating the old rule that promises of future performance are not actionable in fraud. *Cianchette*, 2019 ME 87, ¶¶ 22-24, __ A.3d. __. Mr. Clavet asks this Court to take *Cianchette* one step further, and conclude that when the Law

---

[1] Mr. Dean's attempt to narrow *Cianchette*'s holding is unpersuasive. The Buy/Sell Agreement did not abrogate Mr. Dean's statutorily-imposed duties, and nothing in 31 M.R.S. § 1559 or *Cianchette* suggests that the manager's duty is limited to the business operations of the company. In fact, as Mr. Dean himself points out, the scope of section 1559 is "under this chapter," and the Act has an entire subchapter dedicated to transfers of interests in LLCs. *See, e.g.*, 31 M.R.S. §§ 1571-1574.

Court adopted the Restatement's formulation of intentional misrepresentation stated in Restatement section 525, it effectively adopted Restatement sections 525-530. The Restatement provision Mr. Clavet asks the Court to apply on reconsideration is section 529, which provides as follows: "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." Restatement (Second) of Torts § 529. Mr. Clavet argues here, as he did at the summary judgment hearing, that Mr. Dean's representations with respect to the operational difficulties and unprofitability of the Marina as a business, the bank's request for personal guaranties on the Marina's line of credit, and the $2.5 million valuation, while failing to state the additional or qualifying fact that he was closing in on a $7.9 million deal for the sale of the Marina, are fraudulent under this Restatement provision. However, Mr. Clavet is not merely rearguing the point: he points out that *Cianchette* is the clearest signal yet that our Law Court would adopt Restatement section 529, and urges this Court to apply the provision here.

Mr. Clavet's argument is not persuasive here, whatever its merits may be on appeal. Section 529 was not applicable to the fraud perpetrated by the defendants in *Cianchette*, and the Court's overruling of *Shine*, adoption of section 525, and application of section 530 for its persuasive authority were not unexpected developments. In fact, the change in law had been signaled for some years, as explained in the Law Court opinion itself. *See Cianchette*, ¶¶ 22-24. By 2019, *Shine*— which was decided in 1931—had become something of an outlier, even if it had never been expressly overruled. By comparison, the jurisprudence of fraud by omission has been well-developed in Maine, particularly in recent years, as laid out in the Prior Order. (Prior Order 8-9.) Restatement section 529 would represent a sharp departure from contemporary Maine precedent and greatly expand liability for fraud through omission. In the absence of authority to the contrary,

8

the Court declines to apply section 529 to this case, and instead applies the law as announced by the Law Court and described by this Court in its Prior Order. (Prior Order 8-9.)[2]

CONCLUSION

Based on the foregoing, the entry will be:

1. Mr. Clavet's motion for revision is granted in part and denied in part. Mr. Clavet's motion is GRANTED with respect to his claim for breach of fiduciary duty for Mr. Dean's management of Blue Water. The Prior Order is revised as follows: The second paragraph of page 13 of the Prior Order through the first full paragraph of page 14 of the Prior Order is vacated. As revised, that portion of the Prior Order is replaced with the following:

> "The [LLC] Act expressly imposes fiduciary duties upon the manager of an LLC[.]" *Cianchette v. Cianchette*, 2019 ME 87, ¶¶ 35, __ A.3d __ (citing 31 M.R.S. § 1559(1),(3)). The undisputed facts establish that Mr. Dean was a manger of Blue Water during the relevant period to this lawsuit. The Court therefore concludes that Mr. Dean owed fiduciary duties to the LLC and Mr. Clavet as its other member. Nonetheless, genuine factual disputes on issues of breach and damages preclude entry of summary judgment in Mr. Clavet's favor on this count.

Paragraph one of the Conclusion on page 25 of the Prior Order is also vacated and replaced with the following:

> 1. Defendants Kevin and Cecile Dean's motion for partial summary judgment is granted in part and denied in part. Defendants' motion is granted as to Count VII. Defendants' motion is otherwise denied.

Mr. Clavet's motion is otherwise DENIED.
2. Mr. Dean's motion for reconsideration is DENIED.

---

[2] Practically, however, the ruling with respect to 31 M.R.S § 1559(1),(3) makes Mr. Dean's omissions with respect to the sale of the Marina actionable in fraud in any event. *Glynn v. Atl. Seaboard Corp.*, 1999 ME 53, ¶ 12, 728 A.2d 117 ("Where a fiduciary relationship exists between the parties, 'omission by silence may constitute the supplying of false information.'") (citation and quotation omitted). Pursuant to statute, Mr. Dean as manager was a fiduciary to Mr. Clavet as the other member of Blue Water. Whether he was a fiduciary with respect to Covered remains a factual question under Texas law that will be resolved at trial. (Prior Order 16-18.)

The Clerk is instructed to enter this Order on the docket for this case incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).


**August 2, 2019**          ____/s/_____
       **DATE**                   **SUPERIOR COURT JUSTICE**
                             **BUSINESS AND CONSUMER COURT**

**Emile Clavet**

**v.**

**Kevin Dean, Cecile Dean,
Blue Water Marina, LLC and
Covered Marina, LLC**


**BCD-CV-2018-04**


**Emile Clavet**
         **Plaintiff**

         Counsel:                    Clifford Ruprecht, Esq.
                                     66 Pearl St Suite 200
                                     Portland, ME 04101




**Kevin Dean, Cecile Dean,
Blue Water Marina, LLC and
Covered Marina, LLC**
         **Defendants**

         Counsel:                    George Marcus, Esq.
                                     Daniel Rosenthal, Esq.
                                     16 Middle Street
                                     Portland, ME 04101

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-2018-04

EMILE CLAVET,                              )
                                          )
    Plaintiff,                            )
                                          )          **COMBINED ORDER**
    v.                                    )          **ON CROSS-MOTIONS FOR**
                                          )          **SUMMARY JUDGMENT**
KEVIN DEAN, et al.,                       )
                                          )
    Defendants.                           )

Pending before the Court are Defendants Kevin Dean and Cecile Dean's motion for partial summary judgment and Plaintiff Emile Clavet's motion for partial summary judgment. M.R. Civ. P. 56. Mr. Dean has also moved for voluntary partial dismissal of his Counterclaim. M.R. Civ. P. 41(a)(2). All motions are opposed. The Court heard oral argument on the motions on May 7, 2019. Clifford Ruprecht, Esq. represented Mr. Clavet and George Marcus, Esq. represented Mr. Dean and Mrs. Dean.

FACTS

Mr. Clavet and Mr. Dean own many companies together. Two of those companies—Blue Water Marina, LLC, and Covered Marina, LLC (the "Marina Companies")—owned a marina (the "Marina") in Texas. Blue Water Marina, LLC ("Blue Water") is a Maine LLC; Covered Marina, LLC ("Covered") is a Texas LLC. (Def's Supp'g S.M.F. ¶¶ 31-32.) Mr. Clavet and Mr. Dean each owned fifty percent of the membership interest in each of the Marina Companies and were both managers of each company pursuant to the operating agreements for those entities. (Def's Supp'g S.M.F. ¶¶ 33-34.) Ownership of the Marina was split between the two Marina Companies. (Def's Supp'g S.M.F. ¶ 36.) The Marina was the Marina Companies' only asset before the Marina was sold to a third party, TCRG Opportunity X, LLC ("TCRG"). As explained in more detail below,

1

mere days before Mr. Dean sold the Marina to TCRG for $7,900,000, Mr. Dean purchased Mr. Clavet's membership interests in those companies for $1,090,000.

On August 30, 2016, an agent for TCRG named Keith Donley contacted Mr. Dean to inquire about whether he would be interested in selling the Marina. (Pl's Supp'g S.M.F. ¶ 1, Def's Opp. S.M.F. ¶ 1.) Mr. Dean responded on September 9, 2016 with a proffered selling price of $8.5 million. (Pl's Supp'g S.M.F. ¶ 2.) On September 12, Mr. Donley told Mr. Dean to call him for an oral counteroffer and told him that he would provide a written counteroffer as soon as the legal descriptions for the property to be transferred were completed. (Pl's Supp'g S.M.F. ¶ 3.) The next day, on September 13, Mr. Dean spoke with TCRG's attorney, Carey Locke, about the legal descriptions of the property, the timing of the transaction, and other details. (Pl's Supp'g S.M.F. ¶ 4.)

The same day, September 13, Mr. Dean told Mr. Donley that he had spoken with Mr. Locke, they were working through the legal descriptions, the attorney was drafting an agreement, and that the Marina Companies would want to counter TCRG's counter-offer at $8 million to cover Mr. Donley's commission. (Pl's Supp'g S.M.F. ¶ 5.) On September 15, Mr. Dean asked Mr. Donley for an update on status, and Mr. Donley responded that he had sent a purchase agreement to TCRG's owner for review and signature. (Pl's Supp'g S.M.F. ¶ 6.) The next day, September 17, Mr. Donley texted Mr. Dean to say he had sent Mr. Dean an offer signed by TCRG's owner, and which had been drafted by Mr. Locke after Mr. Dean's conversation with him. (Pl's Supp'g S.M.F. ¶ 7.) At some point, Mr. Donley told Mr. Dean that TCRG was willing to pay $7.5 million for the Marina, although Mr. Dean could not remember what day Mr. Donley told him this. (Pl's Supp'g S.M.F. ¶ 8.) On September 16, Mr. Dean sent "comments and a counter" to Mr. Donley. (Pl's Supp'g S.M.F. ¶ 9.) The next day, September 17, Mr. Dean again contacted Mr. Donley to say that

2

certain noncontiguous assets could be excluded and that the Marina Companies "could take the $7.5m[illion] offer as is." (Pl's Supp'g S.M.F. ¶ 10.)

Sometime after that, but prior to September 22, Mr. Dean communicated two requests to TCRG: a purchase price of $7.9 million and that TCRG pay for the costs of surveys. (Pl's Supp'g S.M.F. ¶ 11.) On September 22, 2016, TCRG sent Mr. Dean a signed document labeled "Assets Purchase Agreement," (the "Agreement") which Mr. Clavet refers to as a "purchase and sale agreement" and Mr. Dean refers to as an "option to purchase." (Pl's Supp'g S.M.F. ¶ 12; Def's Opp. S.M.F. ¶ 12.) Whichever moniker is more apt is beside the point; the document is in the summary judgment record and speaks for itself.[1]

On September 27, 2016, Mr. Donley reached out to Mr. Dean to follow up on the "status" of the Agreement; Mr. Dean told Mr. Donley he was waiting on the drafting of a "small transfer of interests," i.e. his purchase of Mr. Clavet's interests in the Marina Companies. (Pl's Supp'g S.M.F. ¶ 21.) Mr. Dean signed the Agreement on September 30, 2016 and post-dated it to October 5, 2016. (Pl's Supp'g S.M.F. ¶ 13; Def's Opp. S.M.F. ¶ 13.)

Simultaneously, Mr. Dean was negotiating with Mr. Clavet to purchase Mr. Clavet's interests in the two Marina Companies. Mr. Dean texted Mr. Clavet on September 15, 2016 that a representative of American Bank (the "Bank") (which had extended a line of credit of around $330,000 for the Marina) "want[ed]" the two men and their wives to personally guarantee the line of credit in order to extend the line of credit for another year. (Pl's Supp'g S.M.F. ¶ 15.) Mr. Dean argues that this is materially different than saying that the Bank was "requiring" these personal guaranties. (Def's Opp. S.M.F. ¶ 17.) The text message is in the summary judgment record:

---

[1] Furthermore, Mr. Dean indisputably never apprised Mr. Clavet of the Agreement, thereby denying Mr. Clavet the opportunity to read the Agreement and decide for himself whether it should affect the price he would charge Mr. Dean for his interests in the Marina Companies. (Pl's Supp'g S.M.F. ¶ 14.)

[The Bank] wants [our wives] and you to sign for line of credit renewal. He let me get it done the first time but I think last year's loss spooked him . . . If you don't want to do that then give me a price you want for your portion of the marina or figure a swap of other stuff.

(Pl's Supp'g S.M.F. ¶ 15.)

The two men then discussed how to value Mr. Clavet's interests in the Marina Companies; Mr. Dean gave Mr. Clavet a lot of accurate information about the problems with the Marina;[2] Mr. Clavet asked Mr. Dean what he thought they were worth, and Mr. Dean suggested the Marina Properties were worth what they originally paid for them years earlier, $2.5 million, minus debt. (Pl's Supp'g S.M.F. ¶¶ 17-18.) By September 22, Mr. Dean told the men's corporate lawyer, Shawn Bell, that the two men had reached an agreement for Mr. Clavet to sell his interests in the Marina Companies to Mr. Dean. (Pl's Supp'g S.M.F. ¶ 20.) Mr. Clavet and Mr. Dean met on September 27, and by September 28, Mr. Bell had finished drafting documents for the sale of Mr. Clavet's interests in the Marina Companies to Mr. Dean. (Pl's Supp'g S.M.F. ¶¶ 22-23.) That same day, September 28, Mr. Clavet went into the office and signed the transfer documents without reviewing them and without meeting with Mr. Bell. (Pl's Supp'g S.M.F. ¶ 25; Def's Supp'g S.M.F. ¶ 44.)

In October 2013, Mr. Dean and Mr. Clavet executed a Buy/Sell Agreement that governed either party's sale of his interest in the Marina Companies (and another unrelated jointly owned company). (Def's Supp'g S.M.F. ¶¶ 39.) The Buy/Sell Agreement is part of the summary judgment

---

[2] It is undisputed that the Marina had operational issues that drove down its price as a business. (Def's Supp'g S.M.F. ¶¶ 37, 51-52, Mr. Clavet does not say so specifically but he probably would not quarrel with Mr. Dean's valuation of the Marina as a going concern. As it turned out, the Marina was worth much more than that to TCRG as real estate, as opposed to as a business. Mr. Clavet's quarrel is that Mr. Dean should have told Mr. Clavet about his negotiations with TCRG, whether Mr. Dean believed that the sale would consummate or not, so that Mr. Clavet could decide whether to factor those negotiations into his valuation of the Marina Companies. Mr. Clavet also disputes the notion that Mr. Dean did not believe the sale was going to happen.

4

record and the parties seem to agree that it applies to the sale of one man's interest to the other. Its materiality to the issues presented by the instant motions for summary judgment is disputed.

With his Answer to Mr. Clavet's Complaint, Mr. Dean filed a Counterclaim that alleged Mr. Clavet had used many of the businesses the two men owned in common for his own self-enrichment over the years or had pursued business opportunities individually that properly belonged to one of the jointly-owned businesses. Mr. Clavet moves for summary judgment on Mr. Dean's Counterclaim. Mr. Dean only opposes that motion as to one particular business deal; as to the rest of the allegations in the Counterclaim, Mr. Dean moves for their voluntary dismissal, without prejudice. For reasons explained below that motion is denied.

The one business deal that Mr. Dean pursues on its merits in the face of Mr. Clavet's motion for summary judgment on the Counterclaim is Mr. Clavet's development of a subdivision with his wife and her family (the "Charity Shores Subdivision"). In essence, the claim is that Mr. Dean and Mr. Clavet jointly owned a corporation called Diamond Properties, Inc. ("Diamond") and that the development of the Charity Shores Subdivision was a corporate opportunity that belonged to Diamond. What business Diamond has done, and does, is disputed by the parties and frankly very unclear. (Pl's Supp'g S.M.F. ¶¶ 63, 72; Def's Opp. S.M.F. ¶ 121.) The parties do agree that Diamond's most valuable asset is commercial property held for lease in Auburn. (Pl's Supp'g S.M.F. ¶ 72.)

It is undisputed that the land on which the Charity Shores Subdivision was developed was owned by Mrs. Clavet's family for over a hundred years, but that title was not definitively quieted in its favor until 1998. (Pl's Supp'g S.M.F. ¶¶ 97, 99-104.) Mrs. Clavet's mother and father (Mr. Clavet's in-laws) bought out the other heirs, planning to develop a subdivision, and Mrs. Clavet "bought into" the project at her parents' invitation. (Pl's Supp'g S.M.F. ¶ 106-109.) Mrs. Clavet,

5

her husband, and her parents formed an entity called Quahog Bay, LLC which subsequently developed the Charity Shores Subdivision and sold all the units therein. (Pl's Supp'g S.M.F. ¶¶ 110-111.) Mrs. Clavet's father was the de facto "general contractor" of the project, with Mrs. Clavet providing home office support. (Pl's Supp'g S.M.F. ¶¶ 112-113.) Mr. Clavet and Mrs. Clavet provided financial support. (Pl's Supp'g S.M.F. ¶¶ 115.) In other words, this was a "family project." (*See* Pl's Supp'g S.M.F. ¶¶ 116-118.) None of Mr. Dean and Mr. Clavet's jointly-owned companies put any resources into the project or participated in it in any way. (Pl's Supp'g S.M.F. ¶ 119.)

In his opposition motion, and at oral argument, Mr. Dean did not clearly articulate which counts of his counterclaim are implicated by this deal. In his reply memorandum, Mr. Clavet argues that only Count IV, which states a claim for usurpation of joint business opportunities, is germane[3] to his involvement in the development of the Charity Shores Subdivision. Mr. Dean did not claim otherwise at oral argument, instead leaving it to the Court to parse out which Counts it thought should survive summary judgment in light of his near-total abdication in opposition to Mr. Clavet's motion for summary judgment on the Counterclaim. The Court agrees with Mr. Clavet that only Count IV is implicated by the allegations that Mr. Dean has chosen to pursue.[4]

In terms of the Complaint, Mr. Clavet has moved for summary judgment in his favor on Count I (fraud), Count II (breach of fiduciary duty), Count III (negligent misrepresentation), Count IV (unjust enrichment), and for partial summary judgment as to Count VI (fraudulent transfer). Mr. Dean has moved for summary judgment in his favor as to Count I, Count II, and Count III as well as Count VII (aiding and abetting breach of fiduciary duty).

---

[3] Mr. Clavet nonetheless argues that the facts adduced at summary judgment entitle him to a judgment as a matter of law on the merits of this Count.

[4] Moreover, this is the only count for which Mr. Dean adduces evidence and raises argument in opposition to Mr. Clavet's motion for summary judgment on the Counterclaim. *See Savell v. Duddy*, 2016 ME 139, ¶ 18, 147 A.3d 1179 (plaintiff must establish prima facie case for every element of his cause of action to survive summary judgment).

STANDARD OF REVIEW

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). A genuine issue exists where the jury would be required to "choose between competing versions of the truth." *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040. "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Wightman v. Springfield Terminal Ry. Co*., 100 F.3d 228, 230 (1st Cir. 1996)).

DISCUSSION

I.      Fraud

Mr. Clavet and Mr. Dean each move for summary judgment in his favor on Mr. Clavet's claim for fraud (Count I) and fraudulent misrepresentation (Count III). In Maine, to prevail on a fraud claim (i.e., fraudulent/ intentional misrepresentation), a plaintiff must prove the following elements by clear and convincing evidence:

(1) A party made a false representation,
(2) The representation was of a material fact,
(3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false,
(4) The representation was made for the purpose of inducing another party to act in reliance upon it, and
(5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.

*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280 (citing *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640). Negligent misrepresentation is defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (quoting Restatement (Second) of Torts § 552(1) (1977)).

An omission by silence may constitute the supplying of false information in proof of *intentional* misrepresentation. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996) (emphasis in original). However, this is only true in certain circumstances: where the plaintiff proves either "(1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose." *McGeechan v. Sherwood*, 2000 ME 188, ¶ 61, 760 A.2d 1068 (quoting *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me. 1995)). The "specific relationship" can take the form of either a fiduciary relationship or a duty imposed by statute. *Glynn v. Atl. Seaboard Corp.*, 1999 ME 53, ¶ 12, 728 A.2d 117 ("Where a fiduciary relationship exists between the parties, 'omission by silence may constitute the supplying of false information.'") (quoting *Binette,* 688 A.2d at 903) (citing *Brae Asset Funds. L.P. v. Adam*, 661 A.2d 1137, 1140 (Me. 1995); Prosser and Keeton on the Law of Torts § 106, at 738 (5th ed. 1984)). *See also Dickey v. Vermette*, 2008 ME 179, ¶ 18, 960 A.2d 1178 (Alexander, J., dissenting) (misrepresentation may be proved by omission where there is (1) active concealment of the truth, (2) a confidential/ fiduciary relationship, or (3) a statutory duty to disclose).

"[F]or purposes of *negligent* misrepresentation . . . although not every failure to disclose constitutes a misrepresentation, silence rises to the level of supplying false information when such failure to disclose constitutes the breach of a statutory duty" or a fiduciary duty. *Binette,* 688 A.2d at 903 (emphasis in original). *See also Glynn*, 1999 ME 53, ¶ 12, 728 A.2d 117. In other words, in

contrast to intentional misrepresentation, active concealment of the truth is insufficient to prove fraud by omission in the context of an action for negligent misrepresentation; a special relationship like a fiduciary duty or statutory duty to disclose must be proven. *See Binette,* 688 A.2d at 903.

Mr. Clavet argues that there is undisputed evidence of both affirmative misrepresentations and misrepresentations by omission. Principally, Mr. Clavet argues that Mr. Dean's failure to disclose his negotiations with TCRG for the sale of the Marina constitutes a false representation by omission in the context of Mr. Dean's purchase of Mr. Clavet's interests in the Marina Companies. Mr. Dean responds that he did tell Mr. Clavet about TCRG's offer and that Mr. Clavet said it sounded like a waste of time. (Def's Opp. S.M.F. ¶ 26.) Whether he did or did not, it is nonetheless undisputed that Mr. Dean did not inform Mr. Clavet of his subsequent discussions with Mr. Donley after his initial outreach on August 30, and never showed him the Agreement. (Def's Opp. S.M.F. ¶¶ 14, 26.)

In this case, there is no evidence that Mr. Dean took proactive steps to hide his negotiations with TCRG from Mr. Clavet. Mr. Dean just never told him about them, and Mr. Clavet never asked. More is required to demonstrate active concealment of the truth. *Kezer v. Mark Stimson Assocs.*, 1999 ME 184, ¶ 24, 742 A.2d 898 ("Active concealment of the truth connotes steps taken by a defendant to hide the true state of affairs from the plaintiff."). Thus, to prove liability in fraud through omission, Mr. Clavet must prove that Mr. Dean owed Mr. Clavet a fiduciary duty or statutory duty to disclose.

As explained in more detail below in the context of Mr. Clavet's claim for breach of fiduciary duty, Mr. Dean did not have a fiduciary or confidential relationship with Mr. Clavet with respect to Blue Water. Mr. Dean thus cannot be held liable in fraud to Mr. Clavet through his failure to disclose Mr. Dean's negotiation for the sale of the Marina as to that entity.

With respect to Covered, which is governed by Texas law, there is a factual question as to whether Mr. Dean had an informal fiduciary relationship with Mr. Clavet, which could give rise to liability in fraud by reason of Mr. Dean's omission. *Entm't Merch. Tech., LLC v. Houchin*, 720 F. Supp. 2d 792, 796-97 (D. Tex. 2010) (citing Tex. Bus. Orgs. Code. § 101.401) (other citations omitted). As explained in more detail below, this factual question remains unresolved, precluding an entry of summary judgment on Mr. Clavet's fraud claim with respect to his omission for Covered as well.[5]

Mr. Clavet argues that nonetheless there is evidence that Mr. Dean made an affirmative, knowingly false statement intended to induce Mr. Clavet to sell his interest to Mr. Dean at a deflated price: the September 15 text message that the Bank "wanted" the two gentlemen and their wives to personally guarantee the Marina's line of credit. Mr. Dean swears that this is an accurate representation of what the Bank had told him at some point and thus not a false statement. (Def's Opp. S.M.F. ¶¶ 36-37.) There is thus a dispute of fact on this point. Mr. Dean seems to make the further argument that the statement could never be actionable because he said the Bank "wanted," as opposed to would require, personal guaranties, and it is always the case that a financial institution would prefer to have personal guaranties on lines of credit. The Court rejects this argument. The factfinder will be entitled to decide for itself what Mr. Dean meant by the text message he sent to Mr. Clavet on September 15 and whether it was a lie. (Pl's Supp'g S.M.F. ¶ 15.)

---

[5] The Court does not rule that if Mr. Clavet prevails on his breach of fiduciary duty claim with respect to Covered that this necessarily results in Mr. Dean's liability for fraud as well. Mr. Dean claims that he never updated Mr. Clavet about his negotiations with TCRG because he never took TCRG's offer seriously himself until after the sale closed— eight days after he received the signed Agreement and two days after Mr. Clavet sold his interest in the Marina Companies to Mr. Dean. (Def's Opp. S.M.F. ¶ 26.) However far-fetched Mr. Dean's story may sound to the Court, fraud is subject to a higher standard of proof and the issue of Mr. Dean's knowledge as to the materiality of his negotiations with TCRG is a factual one that a fact-finder must decide. *See Barr*, 2012 ME 108, ¶ 16, 49 A.3d 1280 (representation must be made with knowledge or reckless disregard of its falsity). As explained below, the reasonableness of Mr. Clavet's reliance is likewise an unresolved factual issue precluding an entry of summary judgment in Mr. Clavet's favor on his claim of fraud.

Finally, there is a dispute of fact as to whether Mr. Clavet's reliance on Mr. Dean's representations was reasonable. *Barr*, 2012 ME 108, ¶ 16, 49 A.3d 1280; *Chapman*, 568 A.2d at 830. As Mr. Clavet conceded at the oral argument, to enter summary judgment in his favor, the Court would have to weigh the evidence and determine that it is so one-sided that even in light of his higher standard of proof no reasonable juror could find that Mr. Clavet's reliance was not reasonable. There is substantial evidence as to Mr. Clavet's sophistication and independence in his business dealings, and it is undisputed that Mr. Clavet took no steps to independently verify (1) whether there were any pending offers for the sale of the Marina and (2) whether the Bank was requiring (or would like) personal guaranties from him and his wife to renew the line of credit. At this stage, Mr. Dean is entitled to all reasonable inferences in his favor. *See Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18. The factfinder must weigh the evidence and determine whether Mr. Clavet has proved to a clear and convincing standard that his reliance was reasonable.

In conclusion, there are multiple genuine issues of material fact as to whether Mr. Dean is liable to Mr. Clavet for intentional or negligent fraud. Both motions for summary judgment are denied as to Count I and Count III of the Complaint.

II.     Breach of Fiduciary Duty

In Maine, a fiduciary duty arises at common law with "(1) the actual placing of trust and confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties." *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 18, 133 A.3d 1021 (quoting *Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 7, 54 A.3d 710). "To establish the element of disparity of position and influence, [the plaintiff] must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars." *Id.* (quoting *Ramsey*, 2012 ME

11

113, ¶ 9, 54 A.3d 710) (alteration in original). Maine courts "will not impose fiduciary duties based on arms-length business relationships alone." *Ramsey*, 2012 ME 113, ¶ 10, 54 A.3d 710.

Parties may also agree to the imposition (or elimination) of fiduciary duties in their performance of a contract. The LLC Acts of Maine and Texas explicitly allows for this. 31 M.R.S. §§ 1521(3), 1559(3); Tex. Bus. Orgs. Code Ann. §§ 101.401, 101.606. Fiduciary duties may also be imposed by statute. *See, e.g., Moore v. Me. Indus. Servs.*, 645 A.2d 626, 628 (Me. 1994); *Pianka v. Acadia Ins. Co*., No. CV-04-752, 2006 Me. Super. LEXIS 61, *5 (March 28, 2006) (clarifying that fiduciary duty of officer and director of corporation based on corporate law, not tort law) (citing 13-C M.R.S. §§ 831(1), 843(1)).

First, Mr. Clavet argues that the operating agreements for Blue Water and Covered provided for fiduciary duties between the parties. The operating agreements for the two LLCs are attached respectively as Exhibit 1 and Exhibit 2 to Mr. Dean's Affidavit and thus part of the summary judgment record.[6] M.R. Civ. P. 56(c). The language cited by Mr. Clavet comes nowhere near imposing fiduciary duties. It is a *limitation*[7] on the liability of the co-managers (i.e., Mr. Dean and Mr. Clavet), providing that "a Manager's duty of care in the discharge of [his] duties to the [LLC] and the other Members is limited to refraining from grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." (Blue Water Op. Agmt. Art. VII, § 6; Covered Op. Agmt. Art. Art. VII, § 6.) Mr. Dean claims that the transfer of Mr. Clavet's membership interests in the Marina Companies is not governed by the operating agreements in any event, but rather the subsequently-executed Buy/Sell Agreement, which is attached as Exhibit 3 to Mr. Dean's Affidavit. Mr. Clavet does not necessarily quarrel with this proposition, but points

---

[6] *See* Def's Supp'g S.M.F. ¶ 33. Hereafter the operating agreements, Dean Aff. Ex. 1 and Dean Aff. Ex. 2, are cited as Blue Water Op. Agmt. and Covered Op. Agmt., respectively.
[7] Indeed, if anything, this language insulates Mr. Dean from liability for negligent misconduct, such as that alleged in Count III of the Complaint (negligent misrepresentation).

12

out that that agreement is completely silent on the duties owed between the parties in their performance of that contract. The Court agrees. In sum, there is nothing in either operating agreement or the Buy/Sell Agreement imposing or restricting fiduciary duties between the parties.

Turning next to the common law, Mr. Clavet makes the earnest but implausible claim that a fiduciary relationship arose between these highly sophisticated businessmen who, the record reflects, have undertaken their own independent business dealings at least as often as they have chosen to work together. There is no evidence of a great disparity of position and influence between these very sophisticated and experienced businessmen. Moreover, there is no evidence whatsoever of diminished emotional or physical capacity or the letting down of all guards and bars by Mr. Clavet with respect to Mr. Dean. *See Oceanic Inn, Inc.*, 2016 ME 34, ¶ 18, 133 A.3d 1021; *Ramsey*, 2012 ME 113, ¶¶ 7, 9, 54 A.3d 710. As a matter of law, arm's-length business relationships cannot give rise to a fiduciary relationship. *Ramsey*, 2012 ME 113, ¶ 10, 54 A.3d 710.

Finally, at the oral argument, the Court sua sponte asked Mr. Clavet whether 31 M.R.S. § 1559(3) imposed a fiduciary duty on Mr. Dean as manager of Blue Water given the operating agreement's silence on the question of fiduciary duties owed by managers. By way of background, section 1559 of Maine's LLC Act, titled "Duties of Members and Other Persons," provides that "a member not involved in management does not have a fiduciary duty to the [LLC], or to any other member . . . solely by reason of being a member." 31 M.R.S. § 1559(3). At the trial court level, this language has been construed as meaning a manager who is involved in management of the company does owe fiduciary duties to the LLC, and possibly its members, unless those duties are waived in the LLC operating agreement. *See Cianchette v. Cianchette*, No. CV-16-249, 2018 Me. Super. LEXIS 13, at *39 (January 17, 2018); *Gleichman v. Scarcelli*, No. BCD-CV-17-11, 2019

Me. Bus. & Consumer LEXIS 8, *27-28 (March 7, 2019) (citing *id.*). The Law Court has yet to rule on this issue, although the Superior Court's order on summary judgment in *Cianchette* was appealed and argued before the Law Court and remains under advisement.

In response to the Court's question, Mr. Clavet was clear that the Court should not apply that construction of section 1559(3) in this case. Mr. Clavet pointed out that the Law Court will have the final say on this issue, and even advocated for the proposition that section 1559(3) cannot be construed as giving rise to default fiduciary duties for LLC member-managers. Given the unsettled state of the law on this issue, the Court is not inclined to apply a statutory construction neither side is advocating for, notwithstanding the stare decisis that has developed at the trial court level. *See Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1218-20 (Del. 2012) (rebuking trial court for construing identical statutory language in Delaware's LLC Act where neither party was advocating for such a construction). The Court thus concludes that for purposes of the instant motions section 1559(3) does not impose fiduciary duties on the parties as co-managers of the Marina Companies with respect to each other or the Companies themselves.

Instead, Mr. Clavet argued that this Court should conclude that a "limited fiduciary duty" arose between Mr. Dean and himself solely in the context of Mr. Clavet's sale of his membership interests in the Marina Companies to Mr. Dean. Mr. Clavet conceded that the doctrine of a "limited fiduciary duty" is novel under Maine law, and argued that the Court should look to the persuasive authority of the Appellate Division of the Supreme Court of New York and adopt such a doctrine for the purposes of this case. *See Salm v. Feldstein*, 20 A.D. 3d 469 (N.Y. App. Div. 2005); *Blue Chip Emerald, LLC v. Allied Partners, Inc.*, 299 A.D. 2d 278 (N.Y. App. Div. 2002) (overruled in part by *Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1001-02 (N.Y. 2011)). The cases cited are factually distinguishable and not controlling on this Court; but

14

more fundamentally, they do not apply a "limited fiduciary duty" doctrine. In each case, the court holds that a fiduciary duty existed between the parties *by virtue of their relationship* under the common law and statutory law of New York, and that the failure to disclose the existence of third-party offers or negotiations in the context of a buy-out of one part's interest was a breach of that duty. *Salm*, 20 A.D. 3d at 470; *Blue Chip Emerald, LLC*, 299 A.D. 2d at 279 (citing *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 575; *Meinhard v. Salmon*, 164 N.E. 545). In other words, the grounds for the finding of a fiduciary duty were entirely distinct from the circumstances constituting the breach. The cases do not stand for the proposition that a limited fiduciary duty or duty to disclose arises between the parties by virtue of one party's purchase of the other's interest in a company while negotiating the sale of that company (or its assets) to a third-party. They merely stand for the uncontroversial proposition that where one party is a fiduciary, it must disclose third-party offers and negotiations before buying out the other party's interest.

Put simply, either Mr. Dean owed a fiduciary duty to Mr. Clavet, or he did not. If he did, the New York cases cited stand for the proposition that Mr. Dean's failure to disclose his negotiations with TCRG was a breach of that duty as a matter of law. *Salm*, 20 A.D. 3d at 470; *Blue Chip Emerald, LLC*, 299 A.D. 2d at 279. The cases do not support Mr. Clavet's novel theory that a limited fiduciary duty arose between Mr. Dean and Mr. Clavet, solely in the context of the buyout, that obligated Mr. Dean to disclose his negotiations with TCRG.

In sum, Mr. Clavet has not identified a contractual, common-law, or statutory source of Mr. Dean's fiduciary duty to him under Maine law. Mr. Dean is thus entitled to summary judgment in his favor on Count II of the Complaint as it concerns Blue Water.

The issue as it relates to Covered is a bit more complex, because Covered is a Texas LLC.[8] Texas distinguishes between "formal" and "informal" fiduciary relationships. The former is identified as a matter of law; whether the latter exists is a factual question. *Entm't Merch. Tech., LLC v. Houchin*, 720 F. Supp. 2d 792, 796-97 (D. Tex. 2010). Formal fiduciary relationships "are those for which the fiduciary duties are owed as a matter of law, including the relationship between attorney and client, partners, in trustee relationships, or between directors of a corporation and its stockholders." *Entm't Merch. Tech., LLC*, 720 F. Supp. 2d at 796 (accord *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)); *see also Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355, 395-96 (Tex. App. 2012) (majority member/ manager of LLC owes formal fiduciary duty in purchase of minority member's interest).[9] "An informal fiduciary relationship may also give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic or purely personal one." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997) (overruled in part on other grounds by *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 336 n.7 (Tex. 2011). However, "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (quoting *Schlumberger Tech. Corp.*, 959 S.W.2d at 177). "[W]hile a fiduciary relationship or confidential relationship may arise

---

[8] The parties neglected to brief the issue of whether Maine law, Texas law, or both apply to this lawsuit, and instead seem to argue that they are entitled to prevail on summary judgment regardless of which jurisdiction's law is applied. The parties cite authority from Maine, Texas, and several other jurisdictions. Each operating agreement has an unhelpful "choice-of-law" provision that provides that the agreement "shall be governed by and construed in accordance with the laws of" the state in which the Company was organized—Texas for Covered; Maine for Blue Water—"or, to the extent that the Company does business in States other than" the state of organization, "in accordance with the laws of those States to the extent applicable." (Blue Water Op. Agmt. Art. XVI, § 7; Covered Op. Agmt. Art. XVI, § 7.) For purposes of this motion, in the absence of argument either way from any party, the Court assumes that Maine law applies in the case of Blue Water and Texas law applies to Covered.

[9] Mr. Clavet argues that *Allen* is dispositive of his case—inferentially supporting the notion that he would agree Texas law applies to Covered. However, *Allen* is distinguishable because the defendant was (1) the majority member of the LLC and (2) its sole manager. *Allen*, 367 S.W.3d at 391. *Allen* was very clear that as a general proposition, members of a LLC do not owe each other fiduciary duties. *Id.* at 389-90. Here, Mr. Clavet and Mr. Dean (1) own equal fifty-percent membership interests in Covered and (2) are both managers under the operating agreement.

16

from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from the agreement made the basis of the suit." *Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006).

Texas's LLC Act does not have a provision analogous to 31 M.R.S. § 1559(3), discussed above. It merely provides that the operating agreement for the LLC "may expand or restrict any duties, including fiduciary duties, and related liabilities that a member, manager, . . . or other person has to the company or to a member or manager of the company." Tex. Bus. Orgs. Code Ann. § 101.401. *Cf.* 31 M.R.S. § 1521(3)(A). "No Texas court has held that fiduciary duties exist between members of a limited liability company as a matter of law." *Entm't Merch. Tech., LLC*, 720 F. Supp. 2d at 797 (citations omitted); *see also Allen*, 367 S.W.3d at 389-90. However, "[w]hether such a fiduciary relationship exists is typically a question of fact." *Entm't Merch. Tech., LLC*, 720 F. Supp. 2d at 797.

The Court acknowledges that Mr. Clavet does not specifically argue that a different legal standard applies to Mr. Dean's actions with regard to Blue Water and Covered. Instead, Mr. Clavet argues that a "limited fiduciary duty" arose in the context of Mr. Dean's simultaneous negotiations for the purchase of the Marina Companies from Mr. Clavet and sale of the Marina to TCRG regardless of which jurisdiction's law is applied. The Court concluded above that this theory is unsupported under Maine law. While Texas law likewise does not seem to recognize the doctrine of limited fiduciary duty Mr. Clavet argues for in this case, under Texas law, a fiduciary duty may nonetheless arise as a factual matter "from the circumstances of a particular case," although it must be based on a relationship that predates "the agreement made the basis of the suit." *Willis*, 199 S.W.3d at 277.

17

Much of the evidence adduced by Mr. Clavet in support of the imposition of a limited fiduciary duty on Mr. Dean in the context of the agreement made the basis of this suit—that is, Mr. Dean's purchase of Mr. Clavet's membership interests in the Marina Companies—strikes the Court as bearing on the question of whether an informal fiduciary relationship arose between Mr. Dean and Mr. Clavet with respect to Covered. Mr. Clavet sometimes refers to Mr. Dean as his partner—a characterization that Mr. Dean disputes.[10] (Pl's Supp'g S.M.F. ¶ 18, Def's Opp. S.M.F. ¶ 18.) In his own motion for summary judgment, Mr. Clavet emphasizes the parties' relationship and long course of dealing as evidence that a duty arose on Mr. Dean's part to disclose his negotiations with TCRG to Mr. Clavet. (Pl's Mot. Summ. J. 11.) Under Maine law, this course of dealing is insufficient to meet the common law standard for a fiduciary duty to arise. However, under Texas law, this is sufficient evidence to generate a factual issue as to whether an informal fiduciary relationship arose between the parties. *Entm't Merch. Tech., LLC*, 720 F. Supp. 2d at 797; *Willis*, 199 S.W.3d at 277.

In conclusion, while no fiduciary duty arose between the parties under Maine law, there is a factual question whether an informal fiduciary duty arose between the parties under Texas law in the circumstances of this case. Neither party is entitled to summary judgment in his favor on Count II of the Complaint as it concerns Covered.

III.     Unjust Enrichment and Fraudulent Transfer

To be entitled to the remedy of unjust enrichment,  a party must prove (1) that it conferred a benefit on the other party; (2) that the other party had "appreciation or knowledge of the benefit;"

---

[10] Mr. Clavet does not argue—nor do the facts support the proposition—that Mr. Dean and Mr. Clavet were "partners" in the sense that their various joint enterprises were "the association of 2 or more persons to carry on as co-owners of a business for profit. . . ." 31 M.R.S. § 1022(1); *see also id.* § 1044. A factfinder could nonetheless be convinced that the men were and had been "partners" in the colloquial sense, which could give rise to an informal fiduciary relationship under Texas law.

and (3) that the "acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Howard & Bowie, P.A. v. Collins,* 2000 ME 148, ¶ 13, 759 A.2d 707 (citing *June Roberts Agency v. Venture Properties,* 676 A.2d 46, 49 (Me. 1996)). "[T]he most significant element of the doctrine of [unjust enrichment] is whether the enrichment is unjust." *Howard & Bowie*, 2000 ME 148, ¶ 14, 759 A.2d 707. "[T]he remedy of unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay." *Nadeau v. Pitman,* 1999 ME 104, ¶14, 731 A.2d 863. Therefore, the existence of a contractual agreement "precludes recovery on a theory of unjust enrichment." *June Roberts Agency, Inc.,* 676 A.2d at 49 n. 1. "As a further limitation, to pursue unjust enrichment in equity, the plaintiff must lack an adequate remedy at law." *WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 22, 991 A.2d 44 (applying Delaware law).

Multiple factual disputes preclude an entry of summary judgment on Mr. Clavet's count for unjust enrichment. First, without finding facts relative to Mr. Dean's knowledge, intent, and motivations with respect to his simultaneous negotiations for the purchase of Mr. Clavet's interests in the Marina Companies and sale of the Marina to TCRG, it is impossible to conclude that Mr. Dean's enrichment is unjust: the "most significant element" of the remedy. *Howard & Bowie*, 2000 ME 148, ¶ 14, 759 A.2d 707. Second, while Mr. Clavet has not sued Mr. Dean for breach of contract under either LLC operating agreement or the Buy/ Sell Agreement, these contracts nonetheless give rise to a "contractual relationship" between the parties. The Court reserves ruling on whether this contractual relationship forecloses Mr. Clavet from pursuing unjust enrichment as a remedy at trial. Finally, Mr. Clavet may have a legal remedy in tort if he prevails in his claims

19

for fraud or breach of fiduciary duty at trial. Mr. Clavet is entitled to the remedy of unjust enrichment only if his legal remedies are inadequate.

Mr. Clavet concedes that genuine factual disputes preclude an entry of summary judgment in his favor on his fraudulent transfer count, and instead asks for the Court to rule on the issue of Mrs. Dean's liability in the event that a fraudulent transfer is found. Such a ruling is outside of the scope of the function of a summary judgment motion. *See* M.R. Civ. P. 56(a). Mrs. Dean's liability for the purported fraudulent transfer will be determined at trial.

### IV. Mrs. Dean's Liability for Aiding and Abetting

Because Mr. Dean did not owe Mr. Clavet any fiduciary duty with respect to Blue Water, Mrs. Dean is likewise entitled to summary judgment on Count VII of the Complaint with respect to that company. The Court also grants Mrs. Dean summary judgment in her favor on this Count with respect to Covered, notwithstanding the outstanding factual issue of whether Mr. Dean owed Mr. Clavet fiduciary duties with respect to that claim. The summary judgment record shows that Mrs. Dean's involvement in this matter is limited to being the transferee of the Marina Companies in an allegedly fraudulent transfer; her liability, if any, will be established pursuant to that cause of action, stated in Count VI. The facts that have been established distinguish this case from the allegations that survived the defendants' motion to dismiss in *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972).

### V. Mr. Dean's Counterclaim

At the outset, the Court denies Mr. Dean's motion for partial voluntary dismissal.[11] Mr. Dean cites no authority in support of his motion other than M.R. Civ. P. 41(a)(2), which merely

---

[11] Mr. Clavet filed a late response opposing Mr. Dean's motion for voluntary partial dismissal. The Court exercises its discretion under M.R. Civ. P. 6(b)(2) and allows the late-filed opposition, finding that Mr. Clavet's filing was untimely by reason of excusable neglect.

provides that "an action *shall not* be dismissed at the [counterclaim] plaintiff's instance save upon such terms and conditions as the court deems proper." (emphasis added). Mr. Dean is forthright that he wants five of the claims pleaded in his Counterclaim dismissed because through discovery he learned that he was not damaged by Mr. Clavet's purported misfeasance to the extent he alleged in his pleading. Mr. Dean offers nothing in opposition to Mr. Clavet's legal arguments as to why the undisputed facts show he is entitled to a judgment as a matter of law on those claims. Voluntary dismissal without prejudice cannot be an end-run around a counterclaim-plaintiff's burden on summary judgment. *See Savell v. Duddy*, 2016 ME 139, ¶ 18, 147 A.3d 1179 (plaintiff must establish prima facie case for every element of his cause of action to survive summary judgment). The Court concludes as a matter of law that Mr. Dean has failed to carry his burden on summary judgment and that under the undisputed facts Mr. Clavet is entitled to judgment as a matter of law on all counts of the Counterclaim based on Agency Billing, LLC; the "U-Store-It" storage facility; the two mobile home parks in Unity, Maine and Corinth, Maine; the Getchell Agency; and Grace Street Services, LLC.[12]

Mr. Dean substantively opposes Mr. Clavet's motion for summary judgment as to the Counterclaim count for usurpation of joint business opportunities stated against Mr. Clavet with respect to Mr. Clavet's participation in the development of the Charity Shores Subdivision. Mr. Dean claims that this was a corporate opportunity properly belonging to Diamond.[13]

---

[12] "The language permitting a court to specify the 'terms and conditions' of dismissal provides a court with the discretion to dismiss a case with or without prejudice." *Green Tree Servicing, LLC v. Cope*, 2017 ME 68, ¶ 16, 158 A.3d 931 (quoting M.R. Civ. P. 41(a)(2)). "A dismissal with prejudice operate[s] as an adjudication on the merits." *Bank of N.Y. v. Dyer*, 2016 ME 10, ¶ 11, 130 A.3d 966 (quotation omitted) (alteration in original). The Court would act well within its discretion in granting Mr. Dean's motion and nonetheless dismissing these claims with prejudice. Such a ruling is unnecessary because Mr. Clavet prevails on summary judgment in any event.

[13] Mr. Dean seems to concede that a cause of action for usurpation of a corporate opportunity only lies with respect to Diamond, and not the many LLCs the men own together.

The corporate opportunity doctrine prevents a director or officer of a corporation from personally taking advantage of a corporate opportunity without first disclosing the opportunity to the corporation. "[T]he determination of whether an opportunity is a 'corporate opportunity' is a question of law . . . ." *Ne. Harbor Golf Club, Inc. v. Harris*, 1999 ME 38, ¶ 10, 725 A.2d 1018.

> Even if the opportunity to engage in a business activity, in which the officer or director becomes involved, is not learned of through her connection to the business of the corporation, nevertheless, such an opportunity may be considered a corporate opportunity if the officer or director knows it is closely related to a business in which the corporation is engaged or expects to engage.

*Id*. ¶ 11 (quotation omitted). "A party who challenges the taking of a corporate opportunity has the burden of proof," subject to certain exceptions not applicable here. *Ne. Harbor Golf Club v. Harris*, 661 A.2d 1146, 1151 (Me. 1995) (quoting Principles of Corporate Governance § 5.05 (May 13, 1992)).

When the plaintiff has the burden to prove an essential element at trial and it is clear that the defendant would have been entitled to a directed verdict at trial if the plaintiff presented nothing more than was before the court at the summary judgment hearing, then the defendant is entitled to summary judgment. *Webb v. Haas*, 1999 ME 74, ¶ 18, 728 A.2d 1261 (citing *H.E.P. Dev. Group, Inc. v. Nelson*, 606 A.2d 774, 775 (Me. 1992)). Mr. Dean has failed to adduce prima facie evidence of any element of the corporate opportunity doctrine. First, there are no facts in the summary judgment record as to what role Mr. Clavet holds at Diamond. There is one fact from which it might be reasonable to infer that Mr. Clavet and Mr. Dean are shareholders of Diamond. (Pl's Supp'g S.M.F. ¶ 60.) The corporate opportunity doctrine only applies to officers and directors of corporations, and there are no facts in the summary judgment record that Mr. Clavet was either. *See Ne. Harbor Golf Club, Inc.*, 1999 ME 38, ¶ 10, 725 A.2d 1018.

Furthermore, it is undisputed that Mr. Clavet did not come to learn of this corporate opportunity by reason of his involvement with Diamond; this means Mr. Dean must prove that Mr. Clavet knew the opportunity was closely related to a business in which the corporation is engaged or expected to engage. Based on the summary judgment record, not even Mr. Dean knows what business Diamond is engaged in. (Def's Opp. S.M.F. ¶ 121.) There are very few facts, disputed or otherwise, that address what business Diamond Properties engages in. The facts in the summary judgment record are that Diamond Properties: (1) owns commercial property held for lease in Auburn, (2) owns one or more lots in a subdivision in Old Orchard Beach, and (3) "may have been the entity through which" Mr. Clavet and Mr. Dean developed a condominium project. (Pl's Supp'g S.M.F. ¶¶ 63, 72; Def's Opp. S.M.F. ¶ 121.) The inadequacy of the record on this point alone entitles Mr. Clavet to summary judgment on this issue. *See Webb*, 1999 ME 74, ¶ 18, 728 A.2d 1261. Assuming that this is the extent of Diamond's business activities, based on the undisputed facts about the development and the corporation, as a matter of law, the development of the Charity Shores Subdivision is not closely related to a business in which the corporation is engaged or expects to engage. *Ne. Harbor Golf Club, Inc.*, 1999 ME 38, ¶ 10, 725 A.2d 1018.

Finally, Mr. Clavet is entitled to summary judgment on this count for a more fundamental reason. The corporate opportunity doctrine is grounded on the principle that "[c]orporate officers and directors bear a duty of loyalty to *the corporations* they serve." *Ne. Harbor Golf*, 661 A.2d at 1148 (emphasis added). The owners of a corporation are its shareholders; Mr. Dean is not Diamond. Maine's leading cases on the corporate opportunity doctrine were brought by the corporation, not a single dissatisfied shareholder. *See id.*; *see also Ne. Harbor Golf Club, Inc.*, 661 A.2d 1146. Mr. Dean has not suffered any individualized injury separate and apart from the alleged injury to the corporation; his claim is thus properly characterized as a derivative, as opposed to

direct claim. Leaving aside the technical and procedural requirements for initiating the "extraordinary process" of a derivative action, *see Voisine v. Berube*, 2011 ME 137, ¶¶ 4-6, 38 A.3d 310 (citing 13-C M.R.S. §§ 751-758), which were indisputably not complied with in this case, Mr. Dean is not the right person to "step into the shoes" of the corporation and pursue this action given his own personal, as opposed to corporate, interest in the result. *See* M.R. Civ. P. 23B (derivative plaintiff must be situated to "fairly and adequately represent the interests of the members similarly situated in enforcing *the right of the association*.") (emphasis added). *See also Spickler v. York*, 566 A.2d 1385, 1390 (Me. 1989) ("In a shareholder's derivative suit, the wrong complained of is to the corporation, and the shareholder is merely a nominal plaintiff"); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 n.7 (1984) (citation omitted) (Fed. R. Civ. P. 23.1 "intended to prevent shareholders from suing in the place of the [company] in circumstances where the action would disserve the legitimate interests of the company or its shareholders."); *Fere v. Erickson & Sederstrom, P.C.*, 718 N.W.2d 501 (Neb. 2006) (derivative plaintiff "owes the [company] his undivided loyalty" uncolored by ulterior motives, personal interests, or a personal agenda); *see also* M.R. Civ. P. 23B (derivative plaintiff must be situated to "fairly and adequately represent the interests of the members similarly situated in enforcing *the right of the association*." (emphasis added)).

In conclusion, Mr. Clavet is entitled to summary judgment on Count IV of Mr. Dean's Counterclaim for at least three reasons: (1) he has failed to adduce evidence of the elements of the claim, (2) on the evidence that is in the record, the Charity Shores Subdivision was not a corporate opportunity properly belonging to Diamond, and (3) if it were, Diamond, not Mr. Dean, would be the proper party to pursue the claim, and Mr. Dean lacks standing to pursue the claim derivatively on behalf of the corporation.

CONCLUSION

Based on the foregoing the entry will be:

1. Defendants Kevin and Cecile Dean's motion for partial summary judgment is granted in part and denied in part. Defendants' motion is granted as to Count II of the Complaint with respect to Blue Water Marina, LLC and as to Count VII. Mr. Dean's motion is otherwise denied.

2. Plaintiff Emile Clavet's motion for partial summary judgment is granted in part and denied in part. Mr. Clavet's motion is granted with respect to all counts of Mr. Dean's Counterclaim. Mr. Clavet's motion is otherwise denied.

The Clerk is instructed to enter this Order on the docket for this case incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

**June 3, 2019**
     **DATE**

       /s
               **JUSTICE MURPHY**
               **BUSINESS AND CONSUMER COURT**

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-2018-04

EMILE CLAVET,

    Plaintiff,

v.

KEVIN DEAN, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)

**ORDER ON DEFENDANT'S
MOTION FOR ADJUDICATION**

This matter comes before the Court on Defendant Kevin Dean's motion for adjudication that Camden National Bank ("CNB") should not be adjudged trustee with respect to accounts in which CNB is a lender to defendant Kevin Dean ("Adjudication Motion"). Plaintiff Emile Clavet opposes the motion. The Court heard oral argument on the motion on July 2, 2018; Mr. Dean was represented by George Marcus, Esq. and Mr. Clavet was represented by Clifford Ruprecht, Esq.

## BACKGROUND

On May 23, 2018, this Court entered its combined order on pending motions (the "Prior Order") which more fully lays out the facts giving rise to this lawsuit. In addition to denying Defendant Cecile Dean and the Parties-in-Interest Blue Water Marina, LLC and Covered Marina, LLC's motions to dismiss, the Court ordered attachment and attachment on trustee process on the assets of Defendant Kevin Dean as follows:

> Plaintiff Emile Clavet's motion for attachment and attachment on trustee process is GRANTED. The Court ORDERS attachment on all attachable assets of Kevin Dean up to the amount of $2,972,500. The Court further ORDERS attachment on trustee process against all parties in possession of property payable to Kevin Dean to the amount of their attachable credits not to exceed $2,972,500.
> (Prior Order 15-16.)

1

Pursuant to the Prior Order, Mr. Clavet served a summons to trustee on CNB on June 1, 2018. (Def's Adj. Mot., Ex. A.) In response to that summons, CNB filed its trustee disclosure which disclosed the existence of a home equity line of credit ("HELOC") with account number 20241962 naming Mr. Dean as "Primary" account owner and his wife Cecile Dean as "Comaker." (*Id.*; *See* Def's Adj. Mot., Ex. C.) The HELOC is secured by residential property owned solely by Mrs. Dean. Upon service of the summons to trustee, CNB "froze" the HELOC, meaning that it suspended the rights of the Deans to obtain loans pursuant to the account.

## DISCUSSION

Mr. Dean's position is that with respect to the HELOC, CNB should be adjudged not to be a trustee and should be discharged. (Def's Adj. Mot. ¶ 7.) Mr. Dean argues that although his right to receive loans under the HELOC is a contract right and thus a form of property interest, it is not the kind of property that can be subject to trustee process because the contractual right to obtain a home equity loan from CNB under the HELOC is not "due absolutely and not on any contingency." *See* 14 M.R.S. § 2602(4). In support of this proposition, Mr. Dean points to the HELOC Loan Agreement (Def's Adj. Mot., Ex. C), which lists a number of conditions on CNB's obligation to extend money pursuant to the HELOC and lists various contingencies to which Mr. Dean's ability to draw on the HELOC is subject.

Mr. Clavet responds that the HELOC is more akin to a checking account than a loan agreement because the account is "funded with real estate" rather than money, as CNB took title to the residence in the form of a mortgage to secure all "withdrawals" made against the fund balance. (Pl's Opp. to Def's Adj. Mot. 2.) Mr. Clavet further argues that the conditions and contingencies cited by Mr. Dean "are simply the ordinary rights of [CNB] to close the account if the account holders do something to impair the assets held on deposit by [CNB], if various

2

government actions impair the account relationship, and the like." (Pl's Opp. Motion 4.) The main thrust of Mr. Clavet's argument is that the Summons to Trustee is the only obstacle stopping Mr. Dean from simply writing a check for the full available balance of the account—nearly a million dollars (*see* Def's Adj. Mot., Ex. B)—notwithstanding the conditions and contingencies listed in the loan agreement.

An "order discharging the trustee is subject to an immediate appeal as an exception to the 'final judgment' rule, because 'great and irreparable loss' may otherwise result."[1] *Loyal Erectors, Inc. v. Hamilton & Son, Inc.*, 312 A.2d 748, 751-52 (Me. 1973) (citing *Foisy v. Bishop*, 232 A.2d 797 (Me. 1967)). "The burden is upon the plaintiff to show that the trustee should be charged." *Loyal Erectors, Inc.*, 312 A.2d at 756.

"In connection with the commencement of any personal action, [subject to exceptions not applicable here], trustee process may be used in the Superior Court . . . ." 14 M.R.S. § 2601. However, as to certain classes of property, "[n]o person shall be adjudged trustee[.]" 14 M.R.S. § 2602. The parties direct the Court's attention to one such exception for "[d]ebts due defendant:"

> No person shall be adjudged trustee. . . [b]y reason of any money or other thing due from him to the principle defendant unless, at the time of the service of the summons upon him, it is due absolutely and not on any contingency[.]

14 M.R.S. § 2602(4). The parties argue about whether the funds available under the HELOC (nearly a million dollars) are "due absolutely" or on "any contingency." However, the Court does not see the relevance of this provision. The money available under the HELOC is not a "debt due" Mr. Dean. It is a "line of *credit*," *i.e.* a promise to extend credit that is then a debt due *CNB* in the

---

[1] Orders for attachment and trustee process are reviewable on appeal for an abuse of discretion or clear error. *Libby O'Brien Kingsley & Champion, LLC v. Blanchard*, 2015 ME 101, ¶ 5, 121 A.3d 109. However, the question of whether the HELOC is an attachable interest subject to trustee process pursuant to M.R. Civ. P. 4B and 14 M.R.S. §§ 2601-2714 is a question of law subject to *de* novo review. *City of Bangor v. Penobscot Cty.*, 2005 ME 35, ¶ 9, 868 A.2d 177.

3

event that Mr. Clavet draws on the account as he is entitled to under the HELOC Loan Agreement. "[S]ubject to certain exceptions, a party is not chargeable in trustee process with respect to credits, unless *the party* is liable in an action to the principal defendant." Horton & McGehee, *Maine Civil Remedies* §23-3 at 434 (4th ed. 2004) (citing *Loyal Erectors, Inc.*, 312 A.2d 748) (emphasis added). Section 2602(4) would only apply if a debtor of Mr. Dean had a "debt due absolutely and not on any contingency" payable to him. CNB is not Mr. Dean's debtor; it is his creditor. That any loan extended to Mr. Dean on the line of credit is secured by real estate does not transmute it into a "debt due" Mr. Dean.[2] The Court's research on this issue did not uncover any cases in which a HELOC has been attached or a bank extending a HELOC has been adjudged trustee (or "garnishee" as it may be called in other jurisdictions) with respect to a HELOC.

In sum, Mr. Clavet has failed to meet his burden to show that CNB should be adjudged trustee with respect to the HELOC. The Court concludes that the HELOC—or, more specifically, CNB's contractual obligation to extend credit to Mr. Dean pursuant to the HELOC Loan Agreement—is not an asset which can be trusteed pursuant to M.R. Civ. P. 4B and 14 M.R.S. §§ 2601-2714. This conclusion flows from the established principle that "a party is not chargeable in trustee process with respect to credits[.]" Horton & McGehee, *Maine Civil Remedies* §23-3 at 434 (4th ed. 2004). The Court sees no reason to abrogate the rule on the grounds that the HELOC entitles Mr. Dean to credit up to a certain limit or because the resulting debt is secured by real estate.

---

[2] The Court distinguishes the "asset" as to which Mr. Clavet urges CNB to be adjudged trustee—the HELOC—from Mr. Dean's equitable right of redemption of the mortgage securing the HELOC. The latter may be trusteed. Horton & McGehee, *Maine Civil Remedies* §23-3 at 433 (4th ed. 2004); 14 M.R.S. § 2712. By this Order the Court concludes that the former may not.

4

## CONCLUSION

Based on the foregoing it is hereby ORDERED:

That Camden National Bank shall be and hereby is discharged as trustee with respect to Defendant Kevin Dean's HELOC Loan Account, and shall have no duty to Plaintiff Emile Clavet with respect to Mr. Dean's HELOC account and is hereby adjudicated not to be a trustee with respect to that account.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 8/17/18

M. Michaela Murphy
Justice, Business and Consumer Court

Entered on the Docket: 8/20/18
Copies sent via Mail___ Electronically ✓

5

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CV-2018-04

EMILE CLAVET,

   Plaintiff/ Counterclaim-Defendant,

      v.

KEVIN DEAN, et al.,

   Defendants/ Counterclaim-Plaintiff.

)
)
)
)
)
)
)
)
)
)

COMBINED ORDER
ON PENDING MOTIONS

Pending before the Court are Plaintiff Emile Clavet's amended motion for attachment,

attachment on trustee process, and preliminary relief; Defendant Cecile Dean's motion to dismiss;

Parties-in-Interest Blue Water Marina, LLC and Covered Marina, LLC's motion to dismiss; and

Counterclaim-Plaintiff Kevin Dean's motion for attachment, attachment on trustee process, and

preliminary relief.[1] All motions are opposed. Oral argument on all pending motions was heard on

March 28, 2018. Cliff Ruprecht, Esq. appeared for Mr. Clavet and Bernard Kubetz, Esq. appeared

for Defendants.

## FACTUAL OVERVIEW AND PROCEDURAL HISTORY

This case, as originally brought by Mr. Clavet in his Complaint filed in Cumberland County

Superior Court on November 17, 2017, sought recovery from Mr. Dean based on his sale of

Parties-in-Interest Blue Water Marina, LLC, and Covered Marina, LLC (the "Marina Properties"),

two companies that Mr. Clavet and Mr. Dean had co-owned equally, after Mr. Dean bought out

---

[1] Both Mr. Clavet and Mr. Dean's motions are captioned as seeking "preliminary relief" or "preliminary injunctive relief." Mr. Dean subsequently withdrew his claim for permanent or preliminary injunctive relief in his reply memorandum to his motion. (Def's Reply Mot. Attachment 3.) Mr. Clavet's motion does not make clear what preliminary relief he seeks in his motion and did not mention this aspect of his motion at oral argument. The Court thus treats Mr. Clavet's motion as a motion for attachment and attachment on trustee process.

1

Mr. Clavet's interest and subsequently sold the Marina Properties at a substantially higher price to a third party. (Pl's Compl. ¶¶ 4, 6-7, 14, 26, 29.) Mr. Clavet alleges that Mr. Dean subsequently transferred his membership interest in the Marina Properties to his wife, Cecile Dean. (*Id.* ¶¶ 59-70.) The Amended Counterclaim filed by Mr. Dean has expanded the scope of the dispute to encompass much of Mr. Dean and Mr. Clavet's shared business portfolio and the breakup of their thirty-year partnership. (*See generally* Def's Countercl.)

## DISCUSSION

### I. MOTIONS TO DISMISS

#### A. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), courts "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). "Dismissal is warranted when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Id.* "The legal sufficiency of a complaint challenged pursuant to M.R. Civ. P. 12(b)(6) is a question of law" and thus subject to *de novo* appellate review. *Marshall v. Town of Dexter*, 2015 ME 135, ¶ 2, 125 A.3d 1141.

#### B. Ms. Dean's Motion to Dismiss

##### 1. Count VII

Ms. Dean moves to dismiss Count VII of the Complaint on the ground that Maine does not recognize a claim for aiding and abetting a breach of fiduciary duty. (Dean Mot. Dismiss 3-4.) Mr. Clavet responds that Maine law recognizes the joint liability of a person who substantially

2

encouraged and assisted the tortious conduct of another. (Pl's Opp. Mot. Dismiss 3.)

Our Law Court has "explicitly decided as general law that 'conspiracy' fails as the basis for the imposition of civil liability absent the *actual commission* of some *independently recognized tort*[.]" *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972) (emphasis in original); *see also Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283. In other words:

> Maine law generally denies that there is a *separate and independent tort of "civil conspiracy*," [but] allegations of concerted action do operate to assist in the promulgation of an actionable claim that the tort . . . *having been allegedly committed*, all of the named defendants [alleged] to have acted in combination in relation to the [tort] are vicariously libel to plaintiff for its commission . . . . Thus, the allegations of the existence of a "conspiracy," and of acts done in furtherance of it, serve to make the claim of a [tort] committed by one . . . defendant . . . a sufficient claim of liability for the entire damage as attributable to each of the other defendants.

*Cohen*, 288 A.2d at 111-12 (emphasis added). In short, under Maine law, if two people conspire to commit a tort but no underlying tort is committed, no claim lies for the mere act of conspiring. But if an underlying tort is actually committed by one person, the other person who encourages and assists the actual tortfeasor can be jointly liable for "conspiring" in its commission.

Here, Mr. Dean is alleged to have committed the tort of breach of fiduciary duty. (Pl's Compl. ¶¶ 43-45.) Ms. Dean is alleged to have encouraged, aided, and participated in Mr. Dean's actions in breach of his fiduciary duties of Mr. Clavet. (*Id.* ¶ 68.) Contrary to Ms. Dean's argument on her motion to dismiss, Mr. Clavet was not required to additionally allege the existence of a fiduciary relationship between himself and Ms. Dean in order for her to be liable to Mr. Clavet under a conspiracy theory. (Dean Mot. Dismiss 4.) Such a requirement would effectively eliminate liability for a person who encourages and assists another person in committing a tort, such as

3

breaching a fiduciary duty. Provided the underlying tort is alleged to have been completed, the *Cohen* Court expressly acknowledged that the person who encourages or assists the actual tortfeasor can be held liable under a conspiracy theory. *See Cohen*, 288 A.2d at 112. Indeed, in *Cohen*, it was reversible error for the trial court to dismiss the defendants who were alleged to have conspired in the commission of the tort of libel by another defendant. *Id.* This Court therefore declines to dismiss Count VII because the facts alleged are sufficient to state a claim against Ms. Dean for aiding and abetting Mr. Dean in his breach of fiduciary duties owed to Mr. Clavet.

### 2. Count VI

In his opposition to Ms. Dean's motion to dismiss, Mr. Clavet points out that the Complaint states a claim against Ms. Dean for fraudulent transfer, for which claim Ms. Dean does not raise an argument for dismissal in her motion. (Pl's Opp. Mot. Dismiss 6.) Ms. Dean addresses this claim in her reply memorandum and argues for its dismissal. (Dean Reply Mot. Dismiss 1-3.)

Section 3575 of Title 14 of the Maine Revised Statutes defines a fraudulent transfer as to a present or future creditor:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: A. With actual intent to hinder, delay or defraud any creditor or debtor; or B. Without receiving reasonably equivalent value in exchange for the transfer or obligations and the debtor; (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

*Id.* Ms. Dean's principle argument is that she cannot be liable as the recipient of a fraudulent

4

transfer, because the allegation that she did not take the ownership interests in the Marina Properties in good faith or for reasonably equivalent value (Pl's Compl. ¶ 65) is an element of the fraudulent transfer claim against *Mr. Dean*, and not an individual cause of action against Ms. Dean. (Dean Reply Mot. Dismiss 3.) While this may be true, Ms. Dean could nonetheless be held liable pursuant to a fraudulent transfer claim to the extent of her interests in the Marina Properties. *See* 14 M.R.S. § 3579(2)-(3). The Court thus rules that Count VI states a claim against Ms. Dean.

### 3. Conclusion

Based on the foregoing, Ms. Dean's motion to dismiss is DENIED.

### C. **The Marina Properties' Motion to Dismiss**

The Marina Properties argue that they should be dismissed from this lawsuit because there are no allegations or claims against the Marina Properties themselves. (Marina Props. Mot. Dismiss 3.) The Marina Properties further argue that they are not indispensable or necessary parties under M.R. Civ. P. 19. (*Id.*) Mr. Clavet responds that it is immaterial that the Complaint does not state a claim against the Marina Properties because that is not the reason they were joined in this lawsuit. (Pl's Opp. Mot. Dismiss 1-3.) Rather, Mr. Clavet argues that they were joined because their interests are potentially implicated by the relief sought. (*Id.* 1.) Mr. Clavet thus directly disputes the Marina Properties' proposition that their joinder is not mandatory under M.R. Civ. P. 19. (*Id.* 2-3).

A person subject to service of process "shall" be joined in a lawsuit when that person "claims an interest relating to the subject of the action" and "disposition of the action in the person's absence may [either:] (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring . . . inconsistent obligations by reason of the claimed interest." M.R. Civ. P. 19(a). The

rule "protects unjoined but interested parties by assuring that their interests will not be prejudiced without their participation and it protects active parties by assuring that issues will not have to be relitigated." *Ocwen Fed. Bank, FSB v. Gile*, 2001 ME 120, ¶ 14, 777 A.2d 275. *See also Gauthier v. Gerrish*, 2015 ME 60, ¶ 11, 116 A.3d 461 ("Rule 19(a) require[s] the joinder of a party holding a property interest that will be affected by the litigation.").

As a result of the claims pleaded here against Mr. Dean and Ms. Dean, the Court could rule Mr. Clavet is entitled to relief implicating the interests of the Marina Properties. (*See* Pl's Compl. ¶ 56-61, Prayer for Relief at *6.) If the Court grants such relief, Mr. Clavet has a right to be protected against having to relitigate his entitlement to that relief in some later proceeding involving the Marina Properties. Similarly, the Marina Properties have a right to oppose such relief, to the extent their interests are implicated.

The Court thus rules that M.R. Civ. P. 19(a) requires that the Marina Properties be joined in this lawsuit.[2] The Marina Properties' motion to dismiss is DENIED.

## II. CROSS-MOTIONS FOR ATTACHMENT

### A. Standard of Review

Both Mr. Clavet and Mr. Dean (as Counterclaim-Plaintiff) have moved for attachment and trustee process. *See* M.R. Civ. P. 4A(e) ("An attachment may be made by a party bringing a counterclaim . . . in the same manner as upon an original claim."); *see also* M.R. Civ. P. 4B(g) (same). A party seeking either attachment or trustee process must show "that it is more likely than not that the plaintiff will recover judgement, including interest and costs, in an amount equal to or greater than the aggregate sum of attachment . . . ." M.R. Civ. P. 4A(c); M.R. Civ. P. 4B(c); *Libby*

---

[2] The Court notes that its ruling that the Marina Properties are necessary parties is based on the remedies sought by Mr. Clavet in this case, and the impact that relief could have on the Marina Properties' assets. The Court does not mean to suggest that an entity is always a necessary party when members or owners of that entity dispute a transaction that implicates those membership or ownership interests, as opposed to the assets of the entity.

6

*O'Brien Kingsley & Champion, LLC v Blanchard*, 2015 ME 101, ¶ 5, 121 A.3d 109. Accordingly, the movant must show a greater than 50% chance of successfully recovering a judgment. *Richardson v. McConologue*, 672 A.2d 599, 600 (Me. 1996). "Motions for attachment must be supported by affidavit evidence." *Lindner v. Barry*, 2003 ME 91, ¶ 5, 828 A.2d 788 (citing *Wilson v. DelPapa*, 634 A.2d 1252, 1254 (Me. 1993)). Orders for attachment and trustee process are reviewable on appeal for an abuse of discretion or clear error. *Libby O'Brien Kingsley & Champion, LLC*, 2015 ME 101, ¶ 5, 121 A.3d 109.

### B. Mr. Clavet's Motion

#### 1. Factual Support

As noted *supra*, Mr. Dean and Mr. Clavet were long-time business partners. (Clavet Aff. ¶ 2; Dean Aff. ¶ 2.) The Marina Properties were two of several companies that Mr. Dean and Mr. Clavet co-owned equally. (Clavet Aff. ¶¶ 3-6; Dean Aff. ¶ 2.) Mr. Dean had primary managerial responsibility for the Marina Properties. (Clavet Aff. ¶ 6, Dean Aff. ¶ 8(b)-(c).)

On September 15, 2016, Mr. Dean sent Mr. Clavet a text message telling Mr. Clavet the situation with the Marina Properties was dire and the lenders would require Mr. Clavet and his wife to post personal guarantees over the Marina Properties' credit facilities, and suggesting that Mr. Dean buy out Mr. Clavet's interest. (Clavet Aff. ¶ 8; Pl's Ex. A; Dean Aff. ¶ 18.) In their discussions over the following days, Mr. Dean suggested that the fair value of the Marina Properties was the $2.5 million Mr. Dean and Mr. Clavet had originally paid for them, minus the outstanding debt of $320,000. (Clavet Aff. ¶ 9.) Mr. Clavet agreed to this valuation. (Dean Aff. ¶ 19.) The buyout closed on September 26, 2016, with an effective date of January 1, 2016. (Clavet

---

¹ Mr. Clavet and Mr. Dean both attached affidavits in support of their Motion and Opposition, respectively. *See* M.R. Civ. P. 4A(c), (i), 4B(c). The facts laid out in this Part, and on which the Court bases its determination of the likelihood of Mr. Clavet's success on the merits, is thus taken from a limited, preliminary record developed before discovery. *See Porrazzo v. Karofsky*, 1998 ME 182, ¶ 7, 714 A.2d 826.

Aff. ¶ 10; Dean Aff. ¶¶ 21-22.)

Meanwhile, Mr. Dean was purportedly in negotiation with TCRG Opportunity X, LLC, for TCRG to purchase all the Marina Properties' non-cash assets for $7.9 million. (Clavet Aff. ¶ 11.) TCRG provided Mr. Dean with a draft purchase and sale agreement on those terms on or about September 16, 2016. (Clavet Aff. ¶ 13; Dean Aff. ¶ 27.) Mr. Dean executed the purchase and sale agreement with TCRG on October 5, 2016. (Clavet Aff. ¶ 12; Pl's Ex. B; Dean Aff. ¶ 30.) The sale of the Marina Properties was completed on February 5, 2017. (Dean Aff. ¶ 34.)

Mr. Clavet swears that Mr. Dean did not tell him about the pending sale of the Marina Properties' assets, or the "true value" of the Marina Properties based on that pending sale, while he and Mr. Clavet were negotiating the sale of Mr. Clavet's interest to Mr. Dean. (Clavet Aff. ¶ 11.) Mr. Dean swears that he did communicate the broker's "contact" with him to Mr. Clavet between August 31 and September 16, 2016. (Dean Aff. ¶ 35.) Regardless, Mr. Clavet swears he was not otherwise aware of important details of the pending sale. (Clavet Aff. ¶ 11; Dean Aff. ¶ 36.) Accordingly, Mr. Clavet agreed to sell his interest in the Marina Properties to Mr. Dean for $1.09 million, half the value as represented by Mr. Dean (half of $2.5 million minus $320,000 in debt). (Clavet Aff. ¶ 10; Dean Aff. ¶ 36.) Mr. Clavet swears that he would not have agreed to that sale price but for Mr. Dean's misrepresentations. (Clavet Aff. ¶¶ 18-19, 21.)

## 2. It Is More Likely Than Not Mr. Clavet Will Prevail on the Merits

Several of Mr. Clavet's counts against Mr. Dean are based on Mr. Dean's alleged affirmative misrepresentations and misrepresentations by omission during discussions of the valuation of the Marina Properties pursuant to Mr. Dean's buyout of Mr. Clavet's interest in those companies. (Pl's Compl. ¶¶ 33-50.) The limited evidence before the Court supports a preliminary finding that it is more likely than not that Mr. Clavet will prevail on these counts.

8

A defendant is liable for fraud if she makes a false representation of a material fact with knowledge of its falsity or in reckless disregard for whether it is true or false for the purpose of inducing a plaintiff to act or refrain from acting in reliance on the misrepresentation, and the plaintiff justifiably relies on the representation as true and thereby suffers damages. *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9, 832 A.2d 771. Intentional fraud must be proved by clear and convincing evidence. *Rand*, 2003 ME 122, ¶ 9, 832 A.2d 771.

Maine has adopted the definition of negligent misrepresentation from the Restatement (Second) of Torts § 552(a)(1):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rand*, 2003 ME 122, ¶ 13, 832 A.2d 771 (citing Restatement (Second) of Torts § 552(a)(1)) (emphasis omitted).

A fiduciary duty arises at common law where (1) there is an actual placing of trust and confidence in fact by one party in another, and (2) there is a great disparity of position and influence between the parties. *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 18, 133 A.3d 1021. Under Maine law, the members of a LLC may expressly impose or eliminate fiduciary duties for members or managers pursuant to the LLC's operating agreement. 21 M.R.S. §§ 1521(3), 1559(3).

Mr. Clavet points out that the facts averred in his affidavit establish that Mr. Dean made both affirmative misrepresentations to Mr. Clavet and misrepresentations by omission. (Pl's Mot.

---

The parties seem to agree that Blue Water Marina, LLC is a Maine LLC and Covered Marina, LLC is a Texas LLC. (Dean Aff. ¶ 2; Pl's Compl. ¶¶ 5-6.) Texas law thus controls the rules governing the management of Covered Marina. *See* 14 M.R.S. § 1621(1).

9

Attachment 4-6.) It would have been fraudulent to represent that the value of the Marina Properties was $2.5 million if Mr. Dean knew that a prospective buyer was willing and able to pay $7.9 million for the non-cash assets of the Marina Properties and they had an additional $320,000 in cash. (Clavet Aff. ¶¶ 9-10.) It would have been a misrepresentation by omission for Mr. Dean to fail to inform Mr. Clavet of the TCRG negotiations and the subsequent offer. (Clavet Aff. ¶¶ 11-13, 15-18.) Mr. Clavet suggests that his sworn statements establish that Mr. Dean owed him fiduciary duties—and breached that duty through his deception. (*See* Clavet Aff. ¶¶ 2-6, 22.)

Mr. Dean does not necessarily dispute that Mr. Clavet's averments would satisfy the elements of his claims for fraud, breach of fiduciary duty, and negligent misrepresentation. Instead, Mr. Dean argues that the story is not so simple as Mr. Clavet's affidavits would lead the Court to believe. (Def's Opp. Mot. Attachment 6.) Mr. Dean claims that Mr. Clavet's motion presupposes that Mr. Clavet lacked knowledge of the financial condition of the Marina Properties and the potential buyer. (*Id.*) Mr. Dean emphasizes that Mr. Clavet is a highly sophisticated investor who decided to sell his interest in the Marina Properties after months of negotiations and on favorable terms. (Dean Aff. ¶¶ 1, 19-22.) Mr. Dean further points out that he swears that he did inform Mr. Clavet that he had been contacted by a broker for a potential sale of the Marina Properties. (Dean Aff. ¶¶ 25, 35.)

Mr. Dean's argument misses the point. There is no dispute that Mr. Clavet—as well as Mr. Dean—are experienced, sophisticated businessmen who make investment decisions upon their own, independent determination that the terms are favorable. Contrary to Mr. Dean's characterization, the Court does not read Mr. Clavet's affidavit as telling the story of how "he was unwittingly duped into selling his interests in" the Marina Properties. (Def's Opp. Mot. Attachment 6.) Rather, on the preliminary record before it, the Court reads Mr. Clavet's affidavit as telling the

10

story of how his business partner of over three decades lied to him (at worst) and withheld crucial information from him (at best) during their months of negotiations over Mr. Dean's buyout of Mr. Clavet's interest in the Marina Properties. Absent from Mr. Dean's affidavit is any testimony that he disclosed to Mr. Clavet any of the material terms of the offer from the broker or the extent of his negotiations with the purchaser—only that he disclosed that there was an offer. Mr. Dean may well have not taken the offer seriously—even after the broker told him, during a phone call four days before the buyout of Mr. Clavet's interest, that the buyer would be sending him a purchase and sale agreement. (Clavet Aff. ¶¶ 10-11; Dean Aff. ¶¶ 21-22, 27-30.) But regardless, the Court preliminarily finds it is more likely than not that Mr. Dean will be liable for withholding that information and/or failing to account for it in his valuation of the Marina Properties. (Clavet Aff. ¶ 18.) Furthermore, Mr. Clavet's affidavit casts doubts on the timeline sworn to by Mr. Dean. (Clavet Aff. ¶¶ 13-17.) Eventually, a factfinder will need to sort out the details of who knew or believed what, and when. However, based on the limited affidavits and exhibits now before the Court, the Court finds it more likely than not that Mr. Clavet will prevail on Counts I-III of his Complaint against Mr. Dean.

### 3. Conclusion

Mr. Clavet's motion argues that he is likely to prevail on his remaining counts against Mr. Dean. These counts state an alternative claim for relief (Count IV: unjust enrichment), seek a specific remedy that requires liability on a substantive claim for survival, *see Francis v. Stinson*, 2000 ME 173, ¶ 32 n.5, 760 A.2d 209 (Count V: constructive trust); or seek to impose liability on Mr. Dean for his subsequent transfer of the Marina Properties to his wife (Count VI: fraudulent transfer). Mr. Clavet need not demonstrate a likelihood of success on these additional claims at this point because they do not affect the question before the Court. On a motion for attachment,

11

this Court must determine "that it is more likely than not that the plaintiff will recover judgment . . . in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance." M.R. Civ. P. 4A(c).* Based on the Court's finding above that Mr. Clavet is more likely than not to prevail against Mr. Dean on Counts I-III of his Complaint, the Court further finds that it is more likely than not that he will recover judgment in the amount of $2,972,500: the value of his interest in the Marina Properties based on Mr. Dean's sale of the Marina Properties ($3.95 million), minus the amount Mr. Dean agreed to pay Mr. Clavet for his interest ($1.09 million), plus what Mr. Dean still owes Mr. Clavet from the agreed-to buyout price ($112,500).

## C. Defendants' Motion

### 1. Factual Support*

As noted *supra*, the Marina Properties were just two of several businesses Mr. Clavet and Mr. Dean owned jointly. (Clavet Aff. ¶¶ 3, 6; Dean Aff. ¶ 2.) Mr. Dean's Amended Counterclaim alleges Mr. Clavet is liable to him for breach of fiduciary duty, unjust enrichment, misrepresentation, usurpation of joint business opportunities, and breach of the duty of good faith and fair dealing for actions he took relative to certain businesses owned jointly by both men and certain independent investments made by Mr. Clavet that Mr. Dean suggests are closely enough related to the men's jointly held business enterprises to be actionable. (Def's Countercl.; Dean Aff. ¶¶ 37-52.) It is undisputed that both men are highly sophisticated and educated investors who made investments independently of their partnership, and that each man gave the other great discretion and autonomy with respect to decision-making. (Clavet Aff. ¶¶ 11-12; Dean Aff. ¶¶ 2, 5.)

---

* Mr. Clavet's suggestion that there is no insurance or other security available to satisfy his claims goes unchallenged by Mr. Dean in opposition. (Pl's Mot. Attachment 9.)

* *See* this Order at 7 n.3 *supra*. References to the Affidavit of Mr. Clavet in this Part are to his affidavit filed in support of his Opposition to Mr. Dean's motion for attachment and attachment on trustee process. Mr. Dean's affidavit filed in support of his own motion is substantively identical to his affidavit filed in support of his Opposition to Mr. Clavet's motion.

Mr. Dean's affidavit explicates in considerable detail various aspects of the companies both men owned jointly, how those companies interact with each other and with third parties, problems and successes the companies have had, and his perspective on several of Mr. Clavet's independent investments. (*See generally* Dean Aff. ¶¶ 37-52.) Facts averred are discussed to the extent they are relevant in the Discussion section *infra*.

### 1. It Is Not More Than Likely That Mr. Dean Will Prevail on the Merits

While Mr. Dean's Affidavit and Counterclaim—and, to a certain extent, his motion (*see* Def's Mot. Attachment 2-5)—describe a great number of activities undertaken by Mr. Clavet, Mr. Dean's motion only identifies two with quantifiable damages from which the Court may determine "that it is more likely than not that the [counterclaim] plaintiff will recover judgment . . . in an amount equal to or greater than the aggregate sum of the attachment [sought]." M.R. Civ. P. 4A(c). These are (a) Mr. Clavet's purchase and subsequent sale of two mobile home parks located in Unity and Corinth, Maine (the "mobile home parks") and (b) Mr. Clavet's purchase and development of the Charity Shores subdivision and subsequent sale of the lots. (Def's Mot. Attachment 6-10; Dean Aff. ¶¶ 50-52.) The Court thus dedicates its analysis to Mr. Dean's likelihood of success on the merits as to causes of action based on these transactions. M.R. Civ. P. 4A(c).

Mr. Clavet's liability to Mr. Dean for his purchase of the mobile home parks is based on Mr. Dean's sworn statement, "on information and belief," that a business broker—who has regularly been retained by both gentlemen for many years to seek out business opportunities for them jointly—referred the opportunity to Mr. Clavet alone, surreptitiously and at Mr. Clavet's direction. (Dean Aff. ¶¶ 47-50.) On the contrary, Mr. Clavet swears that he learned about the opportunity through advertisements to the general public that the mobile home parks were

13

available for auction. (Clavet Aff. ¶ 22.) A factfinder may eventually be asked to decide which explanation is more credible. But even as a legal matter, the Court is not convinced that the business broker's involvement would make Mr. Clavet's purchase and sale of the parks actionable, and Mr. Dean's motion offers no explanation on that point. There is no evidence that Mr. Clavet used any property or proprietary information of any jointly held LLCs in his purchase and sale of the mobile home parks. (Clavet Aff. ¶ 22.) The Court is unsure how the use of a business broker is relevant, regardless of that broker's former dealings with the parties.

The Charity Shores subdivision is an asset of Quahog Bay, LLC, a company formed by Mr. Clavet, his wife, and his parents-in-law. (Dean Aff. ¶¶ 51-52.) The subdivision is on land that Mrs. Clavet's family has owned for over one hundred years. (Clavet Aff. ¶ 45.) Mr. Dean claims that Mr. Clavet usurped the business opportunity to put a subdivision on the land based on a conversation the two men had about the land in 2014. (Dean Aff. ¶ 51.) Mr. Dean swears that based on that conversation, he believed that Mr. Clavet was utilizing jointly owned development companies to develop the Charity Hills subdivision. (Dean Aff. ¶ 51.)

This single conversation is juxtaposed with Mr. Clavet's averments that the development of Charity Shores was part of a plan negotiated by Mr. Clavet and his wife's family to develop land owned by her family for over a century to benefit her family and involved many family members. (Clavet Aff. ¶¶ 43-52, 54-55.) Notably, Mr. Clavet does not deny that he spoke with Mr. Dean about this project; in fact, he is sure that he did. (Clavet Aff. ¶¶ 51, 53.) However, he swears that it was always clear that the project was not anything Mr. Dean or their joint businesses were involved in, or that Mr. Dean expressed any interest in. (Clavet Aff. ¶¶ 53-55.) Mr. Clavet further swears that he used no property or proprietary information of any jointly-held LLCs in this project. (Clavet Aff. ¶ 52.)

14

These two gentlemen were business partners for over three decades who shared a business office and would regularly confer with each other. (Clavet Aff. ¶¶ 5-6.) While much, even most, of their conversations were likely about joint business concerns, it is more than likely that they also discussed their own individual business projects. (*See* Clavet Aff. ¶¶ 3, 5.) If it is true that Mr. Clavet merely discussed an independent, family-based project on family-owned land with Mr. Dean, that conversation cannot convert the project into a joint enterprise. A factfinder will eventually need to decide which man's characterization of the conversation is more credible, or whether Mr. Dean believed that Mr. Clavet intended to involve Mr. Dean in the project. However, based on the preliminary record now before the Court, the Court finds that Mr. Dean is not likely to prevail on any claims based on that conversation.

## 2. Conclusion

The Court finds that it is not more than likely that Mr. Dean will prevail on any claims based on Mr. Clavet's purchase and sale of the mobile home parks or his development of the Charity Shores subdivision. As these are the only transactions on which Mr. Dean bases his claim that he is more likely than not to recover in an amount equal to or greater than $1,215,000 against Mr. Clavet, Mr. Dean's motion for attachment and attachment on trustee process in that amount is DENIED.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED:

1. Defendant Cecile Dean's motion to dismiss is DENIED.
2. Parties-in-Interest Blue Water Marina, LLC's and Covered Marina, LLC's motion to dismiss is DENIED.
3. Plaintiff Emile Clavet's motion for attachment and attachment on trustee process is GRANTED. The Court ORDERS attachment on all attachable assets of Kevin Dean up to the amount of $2,972,500. The Court further ORDERS attachment on trustee process

15

against all parties in possession of property payable to Kevin Dean to the amount of their attachable credits not to exceed $2,972,500.

4. Defendant/ Counterclaim-Plaintiff Kevin Dean's motion for attachment and attachment on trustee process is DENIED.

_____5 / 23 / 18_____

DATE

_____[signature]_____

SUPERIOR COURT JUSTICE
BUSINESS AND CONSUMER COURT

Entered on the Docket: _5/23/18_
Copies sent via Mail___ Electronically ✓

16